# WHEELING.

CREIGH'S ADM'R *v.* BOGGS *et als.*

Submitted January 13, 1881.  Decided December 17, 1881.

*(PATTON, JUDGE, Absent.)

1. Either party to a written contract for the sale of land may have the same specifically enforced in a court of equity with such corrections in it, as parol proof may show to be necessary to correct a mistake made in reducing the contract to writing.

2. When the mistake was made not in reducing the contract to writing but in the supposition of both parties, that the boundaries of the land named in the contract would include a certain mill-site and on discovering, that it did not, the parties agree by parol to so change the boundaries, as to include the mill-site, and under their direction the surveyor makes a plat and report of the land according to these new boundaries, and the vendor brings a suit to enforce the contract with this alteration, and the defendant in his answer admits this mistake of the parties and its correction producing the corrected boundaries and plat but resists the execution of the contract relying on the statute of frauds, the court will nevertheless specifically enforce such written contract as modified by the parties to correct such mistake.

*Cause submitted before Judge P. took his seat on the bench.

3. A written contract for the sale of land will be specifically enforced, though it be signed only by the party, against whom it is sought to be specifically enforced.

4. A written contract for the sale of land will be specifically enforced at the instance of the vendor, though he be unable to make title to an insignificant part of the land of no peculiar value to the vendee, the court requiring the vendor to make compensation for the land lost by abating its value from the purchase-money.

5. Where a written contract for land has been made, and the vendee dies, and the vendor of the land is compelled to pay taxes incurred after the death of the vendee to prevent the sheriff selling it for delinquent taxes, the heirs and not the administrator of the vendee are bound to refund to the vendor the taxes so paid; and he is not bound to deliver them a deed for the land, till they have done so, though the administrator may have paid him the whole of the purchase-money.

6. A writ of *fieri facias* describes the defendants as A. and B. and C. his sureties as administrator for D. deceased. The forthcoming bond describes them as A., B. and C. This is no variance between the bond and the *fieri facias*.

Appeal from and *supersedeas* to three decrees of the circuit court of the county of Kanawha, rendered respectively on the 12th day of November, 1877, on the 27th day of May, 1878, and on the 11th day of November, 1878, in a cause in said court then pending, wherein Thomas Creigh's administrator was plaintiff, and F. C. Boggs administrator and others were defendants, allowed upon the petition of said defendants.

Hon. Joseph Smith, Judge of the seventh judicial circuit, rendered the decrees appealed from.

GREEN, JUDGE, furnishes the following statement of the case :

On April 1, 1860, Henry Jones and David S. Creigh entered into the following written contract for the purchase and sale of a parcel of land in Nicholas county : " I have sold to Henry Jones a boundary of land being the lower portion of the Witherel tract of land lying on Mumelty creek, and the dividing line is to be Glade creek and following Glade creek to the last bend and then run a *strate* line to Mumelty creek to corner on the west side of said creek, and for said land I bind myself, my heirs, &c., to pay David S. Creigh, his heirs, &c., $5.00 per acre, $500.00 paid in hand and $500.00 paid

next October, and the remainder whatever amount should remain unpaid twelve months is to be given without interest, and the said Henry Jones is to have the privilege of making a dam across the creek free of damages. As witness my hand and seal this 7th day of April, 1860.

"HENRY JONES, [Seal].

"I bind myself to have the deed for the above land as soon as said land is run off this 7th day of April, 1860.

"DAVID S. CREIGH."

The Witherel tract referred to was a tract of some seven hundred acres conveyed to Thomas Creigh by P. B. Witherel November 6, 1824. Thomas Creigh died about January 1, 1848, and by his will he appointed his son-in-law, David R. Preston, and his sons, David S. Creigh, Thomas Creigh and Lewis S. Creigh his executors and authorized them to sell at public or private sale all his real estate and convey the same. They all qualified as such executors in January, 1848. David R. Preston died and Thomas Creigh and Lewis S. Creigh after a while had little to do with the administration of the estate except to sanction what David S. Creigh, who was the sole active executor of this will, might do. And the above contract was intended as a sale by the parties to it and was understood by them as a sale of a portion of the real estate of Thomas Creigh deceased by his executor, David S. Creigh. Shortly after this contract was made, the parties to it undertook to have run off the parcel of land named in it. When the contract was made, both of the parties supposed, that the description of the land roughly stated in it would include two mill-sites one on Glade creek and the other on Mumble-the-peg creek, which mill sites were intended to be sold and purchased by the parties, but it was found, that it would not, as it was supposed it would, include the mill-site on Mumble-the-peg creek; and the line running from one of these creeks to the other was by consent of both parties, who were present, when the surveyor ran off this land, changed, so as to include both these mill-sites. The survey was accordingly made in the presence of the parties setting forth the metes and bounds of the land. Its area was called four hundred and forty acres, but an accurate survey of it shows, that it really contains four hundred and seventy acres. A copy of this survey was

delivered to Henry Jones the purchaser endorsed courses of David S. Creigh's land sold to H. Jones;" and on Jones's death it came into the hands of his administrator, F. C. Boggs.

Shortly after this survey was made, the war broke out, which prevented doubtless the making of the deed. Jones paid $500.00 in cash on April 7, 1860, when the contract was made, and $160.00 in cash on November 13, 1860, and at another time $81.00 was paid after his death in May, 1864, by his executor on an order given on him by David S. Creigh. Both of the parties to this contract died shortly afterwards, and the surviving executors of Thomas Creigh brought a suit in the circuit court of Nicholas county on October 26, 1867, against Francis C. Boggs, administrator of Henry Jones, and his sureties as such administrator, the administrator of David S. Creigh and the heirs of Henry Jones. In this suit a final decree was rendered on May 9, 1872, whereby the court decreed the specific enforcement of this contract according to the boundaries of the land set out in the survey made for the parties to the contract in their lifetime and found the balance due the estate of Thomas Creigh on this contract on May 8, 1872, to be $2,421.24, which it decreed to be paid out of the moneys in the hands of F. C. Boggs, administrator of Henry Jones; and as there had been, pending the suit, transfers among the heirs of Henry Jones of their interest in this land, and it was then uncertain, which of them then owned it, no conveyance of it was then ordered; and as F. C. Boggs had persistently refused to settle his accounts as administrator of Henry Jones, though repeated efforts were made during the suit to force such settlement, and it appeared, that as one of the heirs of Henry Jones in right of his wife and by purchase he then owned most of the land, the court proceeded without such settlement being had to enforce the lien for the payment of the purchase-money aforesaid out of this land, which it ordered to be sold, if the same was not paid in a specified time.

The defendants in this suit took an appeal to this Court; and on March 2, 1874, this decree was reversed. The grounds of the reversal were the defective allegations in the bill, and because there was then nothing in the record showing, that

the land belonged to Thomas Creigh, or that he made a will or by it authorized the sale by his executors of his lands; and because the requisite parties had not been made, viz.: the heirs of Thomas Creigh and David S. Creigh, and also certain other persons, N. B. Conner, William C. Rader, Samuel Rader and John Peck and Daniel Peck, who claimed to have adverse possession of small portions of the land. But this Court held, that if the facts as above stated were alleged and proven and a proper bill were filed, the doors of equity should be opened to afford proper relief to the plaintiff, unless some insuperable barrier was presented by the defendants. The cause was therefore remanded to the circuit court of Nicholas county with leave to file an amended bill. Thomas Creigh and Lewis S. Creigh, the surviving executors of Thomas Creigh deceased, having been removed and his estate committed to the sheriff of Greenbrier county, Wallace Robinson, he filed the required amended bill making all the requisite allegations of fact, as stated above, and all the necessary parties to entitle the plaintiff to relief, as held by this Court; and in addition to the above facts this amended bill states, that the plaintiff, Wallace Robinson, administrator *de bonis non* of Thomas Creigh, had been compelled to pay a large amount of taxes on said land to prevent its forfeiture, which he claims should be refunded to him. F. C. Boggs, administrator of Henry Jones, filed a demurrer and answer to the bill. The answer denies the allegations in the bill, as above stated, and states numerous other affirmative matters not necessary to be here stated, except so far as they will be stated in the opinion, as no attempt was made to prove them. The facts stated in the amended bill were proven in the cause by the plaintiff. The heirs of Thomas Creigh, deceased, filed their answer admitting the allegations of the bill and asking the specific execution of the contract. The administrator and heirs of David S. Creigh filed their answer admitting the allegations of the amended bill to be true and stating, that they claimed no interest in the said land as heirs of David S. Creigh, as he had no individual interest in it and only sold it as executor of Thomas Creigh. As to the other defendants the bill was taken for confessed.

The cause was remanded to the circuit court of Kanawha

county, because the judge of the circuit court of Nicholas county had been so connected with it, that he could not properly hear and decide it. This order was made by the consent of all parties. An order of reference was made by the circuit court of Nicholas county at the August term, 1875, directing John E. Kern to settle the administration-accounts of F. C. Boggs, administrator of Henry Jones, deceased, and directing a convening of the creditors of Henry Jones, deceased, in the manner prescribed by law, and directing him also to ascertain and report a special account between the plaintiff and Henry Jones's estate ascertaining the number of acres of land contained in said sale, and whether there were any other surveys within its bounds claimed adversely to said Jones and Creigh, where they commenced and their relative value as compared with the whole land sold and the balance due, if their value be deducted. A report under this order was made dated January 17, 1876, which stated, that publication for the creditors of Thomas Creigh, deceased, had been made in the proper manner, and none had appeared but the plaintiff, whose claim, if no deductions were made because of adverse claimants of any part of the land, would amount at date of report to $3,197.87. If Rader's and Conner's claims were deducted calculating them at thirty-three and one half acres and as worth an average value per acre with the whole land, that is, $5.00 per acre, the amount of plaintiff's claim would be $2,800.80; and if Peck's claim of seventy-four acres be also deducted as if of same value, the amount of plaintiff's claim as of January 17, 1876, would be $2,102.61. He afterwards made out a further report under this order of reference dated July 17, 1876, in which he states, that notice was duly given all the parties including Boggs, administrator of Jones, who did not as required appear to settle his accounts. The commissioner however ascertained various debts of the estate, which he had collected, amounting principal and interest to $4,614.73. He knew of no debt of the estate, which he had paid; and he states the accounts over of the plaintiff against the estate calculating them to August 7, 1876, and makes an additional statement showing balance due on August 7, 1876, if the seventy-six acres claimed by Peck are valued at $1.50 per acre instead of $5.00, which would make the balance due

August 7, 1876, $2,639.16. He states, that Conner's claim for twenty-one and one half acres was by patent in 1861 after the purchase made by Henry Jones; that Rader's claim was of like character; that his real lines did not conflict with the land purchased by Jones, but that he had cleared over his lines and enclosed about twelve acres of this land bought by H. Jones; that John and D. A. Peck claimed seventy-four acres of this land under a sale by David S. Creigh; that this sale was made after the sale of Jones, and was a sale of a part of the Witherel tract, and the tract over-lapped, when the lines were run, this sale to Jones to the extent of this seventy-four acres. Its relative value was $1.50 per acre, because it lay on the cliffs of Mumble-the-peg creek. This adversary claim dated from December 28, 1867; that those of Conner and Rader may be good perhaps by length of time; that their land is relatively worth about $5.00 per acre. These reports were returned at one time and are treated as one report. There were no exceptions made to them.

The circuit court of Kanawha, in which the cause was then pending on November 12, 1877, by consent of the plaintiff adopted the alternative statement most favorable to Henry Jones's administrator and heirs, the one which fixed the indebtedness of Henry Jones's estate to the plaintiff on this land as $2,102.61 with interest from January 17, 1876, and rendered a decree against said Boggs and his sureties personally in favor of the plaintiff, who was ordered to execute and file with the papers of the suit a deed to the heirs of Henry Jones, deceased, for this land according to the boundaries set out in the survey filed, which was the one made in the presence of Henry Jones and David S. Creigh in their lifetime deducting these from the claims of Rader Conner and the Pecks. But no execution was to issue upon the decree, till plaintiffs filed with the papers of the suit the required deed; and on plaintiffs' motion James Withrow, a master commissioner of the circuit court of Greenbrier, was appointed a special commissioner for the purpose and was directed to settle an account of and report the amount of taxes, which the plaintiff had been compelled to pay on this land to preserve it from forfeiture; and if upon the coming in of this report nothing was found to be due on account of these taxes to the

plaintiff, then the court will direct the conveyance of the legal title of said land to be delivered to the heirs of said Henry Jones, deceased, or their assignees.

On March 11, 1878, commissioner Withrow made his report. He reports the balance due on taxes paid by the plaintiff being taxes from 1865 to 1876 with interest amounting May 1, 1878 to $229.42, there being allowed in this statement only the taxes on lands on Mumble-the-peg creek; but not having the papers of the cause before him the commissioner says, that he cannot determine certainly, if any less than the whole of this be a proper charge on this Jones land, and if so, what proportion thereof should be a charge on this land. To this report there was no exception; and by a decree rendered May 27, 1878, it was confirmed and said $229.42 with interest from May 1, 1878, was declared a charge on said land; and it was decreed, that unless the defendants or some one of them paid the same within sixty days, so much of said land, as might be necessary, should be sold upon the terms and after the advertisement prescribed to pay this debt and costs of this suit not before taxed, including an attorney's fee of $15.00. The commissioner of sale before receiving any money was required to give a bond with good approved security in manner and conditioned as prescribed by the law.

A *fieri facias* issued on February 18, 1878, for this $2,102.61 with interest from January 17, 1876, and $156.66 costs, which Wallace Robinson, administrator *de bonis non* of Thomas Creigh, recovered by said decree. It was issued against Francis C. Boggs and Stephen A. Jennie and Henry J. Boggs his sureties as administrator of Henry Jones, deceased. It was levied on certain property. A forthcoming bond was given, in which the execution is recited correctly, but it does not state, that the two last named "were sureties of Francis C. Boggs, as administrator of Henry Jones." This bond was forfeited, and a motion to quash it was made, but judgment was rendered awarding execution thereon for $5,257.18, the penalty of the bond and costs of the motion including $10.00 attorney's fee to be discharged by the payment of $2,692.86, amount of the debt, interest and legal costs

with legal interest thereon from November 11, 1878, till paid and the costs aforesaid.

From these decrees of November 12, 1877, and May 27, 1878, and this judgment or forthcoming-bond of November 11, 1878, an appeal and *supersedeas* were awarded on the petition of the administrator and heirs of Henry Jones, deceased.

No appearance for appellant.

*Price & Preston* for appellees cited the following authorities :   9 Leigh 387 ; 6 Rand. 10.

GREEN, JUDGE, announced the opinion of the Court:

The most important and difficult question involved in this record is : Can a written contract for the sale of land be specifically enforced in a court of equity with a parol variation in the courses of the land agreed to by the parties subsequently and admitted in the answer, which variation in the courses was not made as admitted by the answer with a view of modifying the original parol understanding of the parties, which preceded the written contract, but simply to carry out this original parol agreement and understanding, which the written contract failed to do only because of a mutual mistake of the parties, as to whether a certain mill-site would be included in the boundaries set forth in the written contract?   My conclusion is that a court of equity may specifically enforce such contract, though objected to by the defendant in his answer, with such parol variation of the courses and distances.   When the mistake is simply in not correctly reducing the original agreement and understanding to writing, the decided weight of the English authorities is against the right of a court of equity to specifically enforce such a contract as modified by parol-evidence so as to correspond with the original parol-agreement and understanding.   See *Rich* v. *Jackson*, 4 Bro. Rep. 514 ; 6 Ves. 335 n.; *Woollam* v. *Hearn*, 7 Ves. 211c ; *Clinan* v. *Cooke*, 1 Sch. & Lef. 22, 28 ; *Squire* v. *Campbell*, 1 Myl. & Cr. 459.   *Sed vide Martin* v. *Pycroft*, 2 De G. M. & G. 785.   But even the English judges seem to think, that if the mistake in the written contract and the correction to be made is admitted in the answer, it might alter the case.

See *Attorney General* v. *Sitwell*, 1 Y. & C. Exch. 559 ; *Martin* v. *Pycroft*, 2 De G. M. & G. 785.

The decided weight of American authorities in opposition to the English cases is, that the plaintiff may have such mistake corrected and the contract specifically enforced, though the existence of such mistake be denied in the answer. Thus in *Keisselbrack* v. *Livingston*, 4 Johns. Chy. 144, which was a bill for a specific performance of an agreement in writing with a variation to make it correspond with the real understanding of the parties, Chancellor Kent at p. 148 says: "The master of the rolls stopped short of relief in the case of *Woollam* v. *Hearn*, 7 Ves. 211, where a mistake was alleged, because, he said, there was no precedent for allowing parol proof to correct a mistake *in favor of the plaintiff* seeking a specific performance of an agreement. He admits however, that the proof before him made out the plaintiff's case, and that it would have been received as sufficient to refuse relief, if the defendant had sought a specific performance. I am not sufficiently instructed at present to admit the soundness of this distinction, which holds parol-evidence admissible to correct a written agreement as against but not in favor of a plaintiff seeking specific performance of a contract. Lord Hardwick does not appear to have been aware of any such distinction in two cases, to which Sir William Grant referred. Lord Thurlow rejected parol-proof in the case of *Irnham* v. *Child*, 1 Bro. Rep. 92, when offered by a plaintiff seeking performance of an agreement, and at the same time seeking to vary it by parol-proof; but he went upon general grounds applicable to such proof as coming from either party. And why should not the party aggrieved by a mistake in the agreement have relief, as well when he is plaintiff, as when he is defendant? It cannot make any difference in the reasonableness and justice of the remedy, whether the mistake was to the prejudice of one party or the other. If the court has a competent jurisdiction to correct such mistakes (and that is a point well understood and settled), the agreement, when corrected and made to speak the real sense of the parties, ought to be enforced, as well as any agreement perfect in the first instance. It ought to have the same efficiency and be entitled to the same protection, when made accurate under

the decree of the court, as when made accurate by the act of the parties. I shall accordingly direct a specific performance of the agreement as corrected by the proof, and I shall award costs, as was done by Lord Hardwick in *Bingham* v. *Bingham*, 1 Ves. 126, in a decree correcting a mistake." As sustaining the views of Chancellor Kent see *Tilton* v. *Tilton*, 9 N. H. 385; *Gillespie* v. *Brown*, 2 Johns. Chy. 585; *Gooding* v. *McAlister*, 9 How. Prac. R.123. See also *Cowtt* v. *Craig*, 2 H. & M. 618; *Rogers* v. *Atkinson*, 1 Kelly 12; *Rhode Island* v *Massachusetts*, 15 Pet. 233; *Cook* v. *Preston*, 2 Root. 78; *Sanford* v. *Washburn*, Id. 499; *Elmore* v. *Austin*, Id. 415; *Willis* v. *Henderson*, 4 Scam. 13; *Coles* v. *Bowne*, 10 Paige 535; *Hendrickson* v. *Ivins*, 1 Saxton (N. J.) 562, and *Smith* v. *Allen*, Id. 43.

In my judgment the reasoning of Chancellor Kent as above stated is sound, and the American cases on this subject are to be preferred to the English. While none of the American cases cited involve directly the questions presented in this case, yet the reason, which underlies them, in my judgment justifies the conclusion, which I have reached. The record shows, that this case is included in this conclusion. The defendant Francis C. Boggs, administrator with the will annexed of Henry Jones, in his answer, filed when this case was before this court formerly, says: "This respondent says, that the object of the said Jones in the purchase of said land was to secure the mill-site, which was situated thereon, and which was assented to by said Creigh, in order that the interest of Jones's mill-property near by should not be at any subsequent period damaged by opposition. And some short while after the date of the contract Creigh and Jones together with the surveyor went upon the land to survey and make the division line." When they discovered, that the lines called for in the contract would not include the mill-site, "and that the object and design of both of the contracting parties would not be attained, the said Jones and Creigh agreed to survey the land according to their former intentions and directed the surveyor to change the dividing line so as to include the mill-site, which the surveyor did in the presence of said Creigh and Jones, which line was run and marked on trees and did

include the mill-site; and the said Creigh directed the said surveyor to make a plat of said land and mail it to him."

It appears, that this plat was given to Henry Jones and on his death it came into the hands of the defendant, F. C. Boggs, his administrator, and he produced it, as appears from the following decree of November 15, 1871: "And the defendant, Boggs, having filed a paper purporting to be a survey of the lands sold by David S. Creigh to Henry Jones, deceased, made by them in their lifetime and claimed by them as such, which paper is marked X, and the same being adopted here in court by the plaintiff, it is therefore adjudged and decreed, that the said paper be adopted as the true boundary and quantity of land sold as aforesaid." In the amended bill this boundary of the land as stated in this paper X was claimed as the land agreed to be sold, and the specific performance of the agreement was sought stating how it was, that this plat came to be made and the courses to be run; and these allegations are not denied in the answer of Boggs, administrator, who resisted the enforcement of this contract on other grounds.

As the object of the statute of frauds was to prevent the mischief arising from the resort to parol-evidence to prove the existence and terms of an alleged contract in the cases specified in the statute, it would seem, that it should be held inapplicable in this case, as the contract and all its terms were as clearly established in this case, as if it had been fully set out in the original written contract, and according to the spirit of the American cases, which I have cited, it ought to be specifically executed by a court of equity. But it is said, that it ought not to be executed, because it was not mutually binding on each of the parties, it not being signed by all the executors of Thomas Creigh but by one only of them and not by him as executor. As he was acting as the executor of Thomas Creigh, and this was well known to Henry Jones the purchaser, and as he was the acting executor, and his co-executors approved of his action, he might, it seems to me, be well regarded as their agent, and his individual signature might be held as binding all the executors of Thomas Creigh. See *Yesby* v. *Grissby*, 9 Leigh 387. But be this as it may, it is unimportant, for such a contract may be specifically enforced against the parties who signed it

though not mutually binding on the parties, for the statute requiring, that the agreement of the memorandum or note thereof to be signed by the party to be charged therewith or his agent and not by both the parties to the contract, it is held both in courts of law and equity, that a signature by the party, against whom the contract is sought to be enforced, is sufficient.    Fry on Specific Perf. § 346, p. 233 ; *Egerton* v. *Mathews*, 6 East 307 ; *Allen* v. *Bennett*, 3 Taunt 169 ; *Laythoarp* v. *Bryant*, 2 Bing. N. C. 735 ; *Buckhouse* v. *Crosby*, 2 Eq. & C. Abr. 32 pl. 44.

The circuit court ought therefore to have overruled the demurrer to the plaintiff's amended bill ; and this it in effect did, when it rendered decrees for the plaintiff. The formal overruling of the demurrer was unimportant, and the failure of the court to overrule it did not prejudice the defendants. See *Cooke* v. *Thornton*, 6 Rand. 10.

The defendant Boggs, administrator of Jones, in his answer insists, that as David S. Creigh afterwards sold a part of the land, which he had sold to Jones, and as this last sale included the mill-site on Mumble-the-peg creek, the court ought not to specifically enforce the contract. The rule governing courts of equity in such cases is, that if the purchaser can get substantially what he contracted for, the agreement will generally be enforced at the suit of the vendor. See *Evans, &c.*, v. *Kingsberry, &c.*, 2 Rand. 131 ; *Jackson* v. *Ligon*, 3 Leigh 161 ; *McKee* v. *Bailey*, 11 Gratt. 340. In this case the defendant Boggs's answer shows, that his intestate, Jones, desired this mill-site to prevent a third party from erecting a mill there, which would compete with his mill, which was in the neighborhood. Now the contract originally made between Creigh and Jones on its face shows, that at this mill-site Mumble-the-peg creek was the boundary between the lands Creigh sold and those he retained ; and thus it appears, that the object Jones had in view was, he conceived, effected by his ownership of one side of this creek at this mill-site. But when the boundaries were subsequently rearranged, as shown in paper X, the boundary commencing at a point above this mill-site on Mumble-the-peg creek instead of following the creek, as it did in the first contract, by a single course ren to the lowest point on the creek, to which this parcel of

land sold extended.   The apparent object of this was to simplify the boundary; the land lying between this new line and the creek is proven to be of very little value then or now, worth about $1.50 per acre.    Creigh forgetting, I presume, this change in the lines and supposing, he still owned to the creek, sold it to another party to the creek ; and this land afterwards was purchased by the Pecks.

We think under these circumstances, that it is obvious, that Henry Jones attached no importance to the ownership of both sides of the creek at this mill-site, as he did not stipulate for it in his original written contract and probably got it in the amended boundary more by accident in the taking of this straight line instead of the meanders of the creek as the boundary ; and that the loss of the ownership of one side of the creek at this mill-site is under these circumstances not to be regarded as a substantial loss.   In fact, if it had been so regarded, it could have been easily avoided by Jones or his representative, as his title was older and superior to that of the subsequent purchaser from Creigh, and it is, from the way it is stated by the commissioner, fairly to be inferred, that Creigh only entered into a contract with the party, who bought subsequently, and did not make him a deed.   This supposed loss was, I think, evidently regarded both by Jones and his heirs as a loss of no consequence, for had it been, they could easily have prevented its arising.   It furnishes no ground therefore, why this contract ought not to be specifically enforced ; and the same may be said of the two small parcels occupied by Conner and Rader.   Indeed it is not even claimed, that they are substantial losses.   They too were clearly losses, which have arisen from the fault of the defendant, Jones, and his representative; for neither Conner nor Rader has any good title to the small parcels.   And if they can hold them it is only by adversary possession arising since the sale of this land to Jones by Creigh.

The court therefore might well have declined to make any deduction on account of these adversary claims of Rader and Conner, but with the assent of the plaintiff a deduction of the value of these two parcels of land thus held adversely was made, and with like assent a deduction of $5.00 per acre with interest was made on account of said Peck's land, though it is

shown to be worth only $1.50 per acre. The difference in the decree resulting from this deduction of the value of this Peck land at its true value, $1.50, and its assumed value, $5.00, per acre would be some $500.00. And it would greatly exceed an error claimed to have been made against the defendants, the administrator and heirs of Henry Jones, in charging interest for a short but unascertained time, while the Federal forces were in possession of Nicholas county, where Jones lived, and the Confederate government was in possession of Greenbrier county, where Creigh lived.

The only other error in the decrees claimed was in the appointment of James Withrow of Greenbrier as a special commissioner to settle the account for taxes on this land paid by the plaintiffs. There is nothing in this supposed error; for it does not appear, that any objection was ever made in the circuit court to the appointment, and Greenbrier county adjoined Nicholas, where the controversy arose, and was apparently a much more convenient place for such settlement than Kanawha county, whither the case was removed for trial by consent, simply because the judge of Nicholas circuit court could not properly sit in the case. Nor was there any objection to having this settlement made and charging the taxes, which had been paid, to the heirs of Henry Jones and not to his administrator, and if they should not be paid in a reasonable time, ordering a sale of the land to pay them. It was obviously not the duty of the administrator to pay these taxes accruing after the death of Jones but the duty of his heirs, to whom the land belonged; and if the plaintiff was compelled to pay them to prevent the sale of the land for delinquent taxes, in which land he had an interest as a security for the purchase-money, it is obvious, that the money so paid should be refunded, and if not, the land should be sold to pay the amount.

It is also assigned as error, that the amount reported by James Withrow, commissioner, as the amount of taxes paid by the plaintiff on their land is too great. It was $229.42; and his report states, that it was for all the taxes paid by the administrator of Creigh the plaintiff on lands on Mumble-the-peg creek. He does not know, but that these lands on this creek may include other land on this creek, which may

have been taxed to Thomas Creigh's heirs, as he had not access to the papers of this suit. But we have this access and find, that there was not, so far as it appears in this suit, any other lands to be taxed to Thomas Creigh's heirs on this creek. There is no evidence, that Thomas Creigh ever owned any land on this creek except the Witherel tract of seven hundred acres. Of this four hundred and seventy acres, the land in controversy in this cause, were sold to H. Jones. Another tract laid down on the map made by the surveyor under an order in this: cause "as Peck's purchase was afterwards sold by David S. Creigh. It contains, if we may judge by its appearance on the map, some one hundred acres and lies on Mumble-the-peg creek. The balance of this Witherel survey, from one hundred to two hundred acres, does not lie, as this map shows, on Mumble-the-peg creek. We may therefore safely conclude, that the taxes paid by the plaintiff as administrator of Thomas Creigh on the lands on this creek were all paid on this land, which had been sold to Henry Jones; and the commissioner's report is therefore correct. It was unexcepted to in the court below, and so far as the record shows, it was properly confirmed by that court.

It is claimed, that it does not sufficiently appear, that Thomas Creigh had a good title to this four hundred and seventy acres of land sold to Henry Jones. The amended bill alleges, that he had bought it in November, 1824, of Pere B. Witherel, who conveyed it to him by deed duly recorded. This is neither denied nor questioned in the answer. The rule in such cases is, that an enquiry as to title will be directed upon the application of the vendee, or when the proof in the answer renders it doubtful as to whether the title be good. See *Middleton* v. *Selby, supra.* In this case no application for such a reference was made, and there is no evidence tending to throw the least doubt on the title of Thomas Creigh to this land, when he sold it to Henry Jones. On the contrary the evidence and commissioner's report show, that there is now no claimant for any part of this land adverse to Thomas Creigh's title except claimants to very small portions, which adverse titles have arisen since the date of said sale. There is therefore no reason to question the validity of the title of Thomas Creigh to this land ; and the court did not err in not

ordering a specific reference with a view to enquiring as to its validity before decreeing the specific execution of the contract. It was neither necessary nor proper to have the deed for this land to the heirs of Henry Jones delivered, till they paid the taxes, which had been paid by the plaintiff; and it was proper for the circuit court to permit, as it did, an execution to issue against Francis C. Boggs and his sureties as administrator of H. Jones for the $2,102.61 decreed as the balance of the purchase-money due with interest from January 17, 1876, and costs, when the deed for the land sold, other than that claimed by others and not to be paid for, was filed with the papers of the cause executed by the plaintiff and ready to be delivered by the court to the heirs of Henry Jones, when by the payment of these taxes they should entitle themselves to it.

It is true, the record does not expressly show, that this deed executed by the plaintiff properly has been left in the papers of this cause; but, as by the face of the decree he had no right to issue any execution on the decree in his favor, till this was done, and as he issued such execution on February 8, 1878, and no motion was made to quash it by the defendants, the necessary inference is, that this required deed had before that been filed in the papers of this cause; and if it had not been, the defendants in this execution could at any time have had it quashed as improperly issued by the clerk. Their failure to do so makes it certain, that this deed has been placed in the papers of this cause.

This execution was levied, a forthcoming-bond was given and forfeited, and execution was awarded on the forfeited forthcoming-bond on November 11, 1878. The only objection to this proceeding presented is an alleged variance between the execution and its recital in the forthcoming-bond, and the only supposed variance here is in naming the defendants in the execution. They are described as Francis C. Boggs and Henry J. Boggs and Stephen A. Jennie, his securities as administrator of Henry Jones, deceased. In the forthcoming-bond they are described as Francis C. Boggs, Henry J. Boggs and Stephen A. Jennie. These two descriptions are legally identical; for the added words in the execution are simply surplusage in no manner changing the legal effect of an exe-

cution.  It was therefore unnecessary to repeat them in the forthcoming-bond.

The decrees of the circuit court of Kanawha county of November 12, 1877, and of May 27, 1878, must be affirmed with costs and the judgment awarding execution on the forthcoming-bond of November 11, 1878, must also be affirmed with damages according to law; and this cause must be remanded to the circuit court of Kanawha to be further proceed with according to the rules governing courts of equity.

JUDGES HAYMOND AND JOHNSON CONCURRED.

DECREES AFFIRMED.    CAUSE REMANDED.

=====

# WHEELING.

