# WHEELING.

## NORMAN *v.* BENNETT.

*(GREEN, JUDGE, absent.)

Submitted June 18, 1889.—Decided June 28, 1889.

1. SPECIFIC PERFORMANCE—STATUTE OF LIMITATIONS.

J. M. B. by his attorney in fact, T. M., executed a title-bond to J. J. N., dated September 18, 1848, in which is recited the fact, that J. M. B. by his attorney, T. M., had bargained and sold unto the said J. J. N. 150 acres of land more or less lying in a certain boundary situate on the right-hand fork of Steer run, for the consideration of one dollar *per* acre, and said B. binds himself upon the payment of the purchase-money to make unto said J. J. N. a good and sufficient title to the said 150 acres of land to be laid off in an oblong *square*, and shortly afterwards said attorney

---

*On account of illness.

in fact surveyed and marked said 150 acre tract, and J. J. N. took possession and lived upon the same and cultivated and improved it until his death, which occurred in 1865, and on the 17th day of August, 1852, J. M. B. receipted to J. J. N., for two notes on J. L. aggregating $120.00, which when collected were to be applied on said purchase-money, which notes, the evidence shows, were collected by said J. M. B., who admits in his answer to a bill filed to specifically enforce said contract, that said title-bond dated September, 1848, was treated as ratified. *Held:* In a suit brought in June, 1875, by the heirs-at-law of J. J. N., to enforce specific performance of the contract the plaintiffs were entitled to specific performance of said contract under the circumstances proven in the case, and said claim is not barred by the lapse of time or the statute of limitations.

*Kidd & Johnson* for appellants.

*L. Bennett* for appellees.

ENGLISH, JUDGE:

This was a suit in equity brought by Jasper Norman and others against Jonathan M. Bennett and others in the Circuit Court of Gilmer county to enforce the specific execution of a contract alleged to have been made in writing between James J. Norman and said J. M. Bennett acting by Thomas Marshall, his attorney in fact, on the 18th day of September, 1848, for the purchase of a tract of land containing 150 acres, situated on the right-hand fork of Steer run for the consideration of one dollar per acre. It is further alleged, that on the 17th day of August, 1852, the said James J. Norman assigned and transferred to the defendant J. M. Bennett two bonds or notes on one James Long,—one for $45.00, due 1st of September, 1852, and the other for $75.00, due the 1st day of September, 1853,—which bonds bore date September 1, 1849, and were to be "applied as a credit on bonds executed by said James J. Norman to said Bennett for the purchase of 150 acres of land on Steer run, a branch of the left-hand fork of Steer creek, which bonds have long since been paid;" that said tract of land was to be laid off in an oblong square, and was a part of 766 acres granted to said Bennett by the commonwealth of Virginia; that soon after the said purchase the said James J. Norman moved upon and took possession of said tract of land and lived upon the same and made valuable improvements thereon and continued to reside

thereon until his death in 1864 or 1865; that on the 17th day of September, 1866, the said J. M. Bennett in consideration of $150.00 conveyed to the defendant Elijah G. Norman 187 acres of land, which includes said tract of 150 acres; that the said E. G. Norman had full notice and knowledge of the sale of said tract of land by said Bennett to James J. Norman before he purchased the same, and the plaintiffs charge, that there was a written agreement between Bennett and E. G. Norman to the effect, that, if the heirs of James J. Norman ever sought and recovered said land, Bennett was to pay back to Norman a stipulated sum; that before any purchase-money was paid, the said Thomas Marshall, as agent of said Bennet, and a surveyor went upon said land so purchased by J. J. Norman, and surveyed and laid off the same by metes and bounds, and marked the corners and lines thereof, and the plat of said land made by Marshall was delivered to J. J. Norman, and remained in his possession until his death, since which time it has been lost or mislaid, and from that time until his death said J. J. Norman enjoyed peaceable possession thereof by actual residence and cultivation and by clearing out and making large and valuable permanent improvements thereon, and that at the time of his death said land was worth $1,500.00 or $2,000.00.

Calhoun Norman, one of the heirs of Elijah G. Norman, deceased, filed an answer to the original and amended bills of plaintiffs denying the allegations therein contained; and J. M. Bennett filed his answer to the amended bill filed by plaintiffs denying, that Thomas Marshall was ever his attorney in fact with power to sell his lands, except that any sale made by Marshall was subject to his approval and ratification, and unless so ratified such sale was not to be obligatory upon him. He admits in his answer, that the title-bond bearing date on the 18th of September, 1848, as he believes was treated as ratified but alleges, that the 150 acres therein described was part of the tract of 300 acres acquired by said James J. Norman sold for the purchase-money under a decree of said court. He also admits, that he received on the 17th of August, 1852, two notes of James Long,—one for $45.00 due September 1, 1852, and the other for $75.00, due September 1, 1853,—which, when collected, he was to

apply as a credit on the bonds of said Norman for a piece of land on Steer run, for which notes he gave a memorandum in writing as a private individual, and not as an attorney, it being understood at the time that he did not practice law in Randolph county, where the debtor resided, and he did not therefore undertake to collect the same; that it was agreed that the notes should be placed in the hands of Caleb Boggess, who practiced law in Randolph county; that said notes were placed in said Boggess's hands, but whether he collected them defendant does not know, but he denied having collected any part of said money for said notes; that said Boggess shortly after moved to the city of Richmond, and did not return until after the war, and he does not know what disposition said Boggess made of said notes. He, however, denies that said notes were assigned to him, and says he was only acting in the capacity of a friend to carry the notes to said Boggess, and was to credit the said Norman when he received the money. He further alleges, that, if this claim was legitimate against him, it should have been presented before a commissioner having the accounts between Camden, Despard & Bennett against James J. Norman before him for adjudication; and, having failed to present the claim, or having presented it, as the case may be, it is too late now to do so, and he relies upon the statute of limitations, and claims that the plaintiffs' demand is a stale one, and that it has been adjudicated between the parties. He admits, that said Norman moved on the land, but insists, that the land was sold for the purchase-money, and that the tract sold to Elijah G. Norman was a tract altogether different from any tract or tracts sold to James J. Norman.

These answers were replied to generally, and on looking to the proofs in the cause we find, that the plaintiffs filed with their amended bill, as Exhibit 1, a title-bond, which appears to have been signed by J. M. Bennett and by Tom Marshall, attorney in fact, bearing date the 18th day of September, 1848, reciting, that said Bennett by his said attorney had sold to J. J. Norman 150 acres of land on the right-hand fork of Steer run for the consideration of one dollar per acre, payable in three annual installments from the 18th day of September, 1849, to the 1st day of October, 1851, bind-

ing said Bennett on the payment of said purchase-money to make unto said James J. Norman a good and sufficient title to the said 150 acres of land laid out in an oblong square, situated as above described. The plaintiffs also exhibit with said bill as Exhibit No. 2 the receipt of said Bennett for said notes describing them and stating therein, that when collected they were to be applied as a credit on a bond executed to him by said James J. Norman for a piece of land on Steer run, a branch of the left-hand fork of Steer creek.

The plaintiffs also file with their amended bill a deed made by said J. M. Bennett and wife to Elijah Norman for a tract of land containing 187 acres, 1 rood, and 25 poles, as a part of a tract of 766 acres patented to said Bennett, described as located on the waters of Steer creek, which deed bears date September 17, 1866, and which, plaintiffs allege, include the 150 acres sold by said title-bond to J. J. Norman by said Bennett, acting by Thomas Marshall, his attorney in fact. The plaintiffs also file as Exhibits 4 and 5 with their amended bill a copy of the decree in the suit of *G. D. Camden and J. M. Bennett* v. *James J. Norman Administrator and others*, directing a sale of a tract of 300 acres of land on Steer creek, which appears to have been sold for purchase-money amounting to $529.89 due the plaintiffs, Camden & Bennett, also a copy of the report of sale ; and the commissioner's deed was also filed therewith, showing that E. G. Norman became the purchaser for $700.00 and that the same was conveyed to him by special commissioner, from which it will be perceived, that the tract of 150 acres contracted to J J. Norman by said Bennett, acting by Marshall, his attorney in fact, was a different tract belonging to said Bennett and patented to him individually, as is shown by the face of the deed from said Bennett and wife to E. G. Norman for the tract of 180 acres, which includes the tract of 150 acres and was not the joint property of Bennett and Camden.

In support of the allegation in plaintiff's amended bill, that E. G. Norman had notice of the title and claim of said James J. Norman, before said conveyance was made to him by said J. M. Bennett and wife, Jasper Norman a witness for plaintiffs, was asked : "Do you know whether

or not the defendant, E. G. Norman, knew your father resided on the land in controversy before his death and before the purchase of the said E. G. Norman from the defendant J. M. Bennett?" and answered: "He was at my father's residence several times during his lifetime and had dealings with him up to the time of his death." He was also asked: "Do you know whether or not the said E. G. Norman knew of your father's purchase and claim of the land in controversy?" and answered: "I have heard him say quite recently, that he knew my father had bought and claimed the land, before he (E. G. Norman) purchased it of defendant Bennett." He also states, that his father resided on the land in controversy for about fourteen years. He also proves, who were the heirs at law of said J. J. Norman, who appeared as plaintiffs in this suit. It is also shown by the evidence of Milton Norris, a witness introduced by plaintiffs, that J. J. Norman resided on Steer run, a branch of Steer creek, near its head on a tract of land, which is now occupied by E. G. Norman; that he understood him to occupy the same as owner; that he lived there some twelve years, claiming the land as his own; that E. G. Norman is now in possession of the land, and claims it under a purchase from said Bennett; that he had in his possession the agreement between Bennett and E. G. Norman for the land in controversy and read it several times but does not recollect the date; that he does not know what became of said agreement; that he gave it to a gentleman who came around as the agent of Despard, and he was to give it to J. M. Bennett; that in that agreement E. G. Norman purchased two tracts of land,—one containing 300 acres; also a tract of 150, 160 or 170 acres, known as the "Jim Norman Tract." The 300 acre tract he sold as the land of Bennett, Despard & Camden, and the other tract he sold in his own right; the tract sold in his own name or right being the Jim Norman tract. He reserved in his agreement time to consider, whether he would consummate the sale or not. The bond went on to show, what sum said Bennett was to pay back to said Norman, if he did not choose to consummate the sale of the land.

Several of the questions asked these witnesses were ex-

cepted to by the defendant Calhoun Norman because of their leading character, and several of the answers were objected to, because they gave the witness's understanding of the matters inquired about. I have examined the questions objected to as leading and do not think they suggest the answer desired, or that the defendant was prejudiced by allowing them to be answered; and I think, the witnesses could properly give their understanding of the matters in response to the questions asked them, as by giving their answers in that way they were not expressing an opinion.

Said defendant also excepts to the questions seventeen and nineteen, asked Milton Norris, because they refer to a written agreement, which was not produced. It will however be seen, that said agreement had been sent to the defendant, Bennett and has since been produced and is an exhibit in the cause; so that the defendants were not prejudiced by said answer. It is also shown by the evidence of John E. Hays, that he not only had in his possession a receipt for a title-bond executed by Thomas Marshall as agent for J. M. Bennett to James J. Norman for 150 acres of land on the head-waters of the left-hand fork of Steer run, a branch of the left-hand fork of Steer creek, for which the said James J. Norman was to pay one dollar per acre; also that the said Norman at the same time produced a receipt in the handwriting of J. M. Bennett and signed by him for two bonds executed by said James Long to said James J. Norman, the amount of which he did not remember, but his recollection was that said bonds, if solvent, would pay off and discharge the land debt all but about $30.00; that it would lack about $30.00 of paying for the land named in said title-bond, and these bonds were to be applied according to Bennett's receipt, when collected, as payments on the land,—the said 150 acre purchase; that in a subsequent conversation with said Bennett he said he had never got any of said money; that he had put said bonds, or one of them,—did not then remember which,—in Count Stover's hands for collection, and Count had collected one of the bonds and had used the money and had never paid him. James Long states in his deposition, that the $45.00 bond was paid about the year 1852, and the $75.00 bond was paid the next year, which

made $120.00 which went to the use of Bennett; and his wife, Barbara Long, stated the same thing.

From this evidence it is apparent, that said J. M. Bennett on the 18th day of September, 1848, contracted in writing to sell J. J. Norman a tract of land on the right-hand fork of Steer run for the consideration of one dollar per acre; said land to be laid off "in an oblong square;" and agreed to make him a good and sufficient title to the same upon the payment of the purchase-money. It is true, that said Bennett denies in his answer to the amended bill, that Thomas Marshall, who signed said Bennett's name, and affixed his seal to said agreement, was ever his attorney in fact with power to sell his lands, except that any sale made by him was subject to the approval and ratification of said Bennett, and, unless so ratified, was not to be absolutely obligatory upon him, but said Bennett admits in his answer to the plaintiffs' amended bill, that he believes the title-bond bearing date on the 18th day of September, 1848, was treated as ratified, but claims the 150 acres therein mentioned was part of the 300 acre tract.

Yet in Bennett's answer to the original bill he admits, that he did sell two tracts of land on Steer run of Steer creek in Gilmer county to James J. Norman; that he does not remember the quantity in either tract, and calls for the production of the title-papers not to furnish evidence of the sale, but of the conditions of the sale; that he is quite sure, that he received no part of the purchase-money on either tract, and that he filed his bill to enforce the payment of the purchase-money in said Circuit Court, and a decree was rendered for the sale of both said tracts, and they were sold, and the sale confirmed by the court, and that upon a balance struck the plaintiffs would be found to be in his debt; but on examining the decree, which is filed as Exhibit No. 4 with plaintiff's amended bill, we find that G. D. Camden and J. M. Bennett were plaintiffs in the suit against J. J. Norman's administrator and others, and that a 300 acre tract of land on Steer creek was directed to be sold for the purchase-money thereof, amounting to $529.89 instead of the 150 acre tract; and by the report of the special commissioner appointed to sell the same it appears to have brought $700.00 and Elijah G. Norman became the purchaser.

It is also clear that said J. M. Bennett approved and ratified the action of Marshall in making the sale of the 150 acre tract of land to J. J. Norman, by receiving the notes of Long, amounting to $120,00 as part of the purchase-money, to be credited on the bond executed to him by said Norman when collected, as shown by his receipt filed with plaintiff's amended bill. And it appears by the evidence of Isaac Norman, that J. M. Bennett stated to him, that he had got part of the money and part he had not got; and though it appears from the evidence in the cause, that said J. M. Bennett intrusted the collection of said Long notes to an attorney, who collected and used part of the money and never accounted to him for it, yet it is clear, that, when the money was collected by said attorney, he received it as the agent of Bennett, and so far as J. J. Norman was concerned, when the money went into the hands of Bennett's attorney, Norman was entitled to credit for it on his indebtedness for the purchase-money of said land, because, if Bennett selected agents, who were not trustworthy, to transact his business, who collected and spent the money, the loss ought not to fall on Norman. It also appears that in pursuance of said sale James J. Norman took possession of the 150 acre tract of land, as it was surveyed by some surveyor for him in the shape of a parallelogram; and Levi Boggs, a witness, who testified in the case, states, that the widow of said J. J. Norman placed in his hands a plat of said land, which upon calculation he found to contain 149 acres.

The report of O. H. P. Lewis, surveyor, who surveyed said tract under an order of court in said suit, states, that on the 11th of May, 1886, he found an old marked line and ascertained, that the rectangle claimed by plaintiff contained 169 acres. The witness Milton Norris states, that in the year 1855 he ran a part of the lower line, and since the war he ran around the entire tract for E. G. Norman and in his last survey found the original lines but found them longer than the calls and containing more acres than was originally estimated. James J. Norman remained on said land until his death in 1865 and made valuable improvements on it; and on the 6th day of November, 1865, said J.

M. Bennett entered into an agreement with Elijah G. Norman to sell him said 300 acre tract and also said 150 acre tract, which, he says on the face of said agreement, James J. Norman claims to have purchased from J. M. Bennett through his agent, lying near said 300 acre tract, for $150.-00, which the said Bennett not having authorized reserves time to consider, whether he will recognize or confirm, or in any manner give it validity. In the mean time said E. G. Norman was to take possession of the land, improve it, and otherwise use the said last-mentioned tract as he might deem best, and was to continue to occupy it for such time as might be consistent with said contract; and we find in said agreement the following : "In consequence of the insolvency of the said James J. Norman it is known that the 300 acre tract of land must be sold to satisfy the vendor's lien, and the last tract (meaning the 150 acre tract) must be either sold for the supposed purchase-money, or be cancelled, *etc.* This agreement was signed by both J. M. Bennett and Elijah G. Norman; and on the 17th day of September, 1866, said J. M. Bennett and wife seem to have conveyed a tract of land containing 187 acres, 1 rood, and 25 poles, which the evidence shows includes said 150 acre tract to E. G. Norman for the consideration of $150.00.

Although the agreement between J. M. Bennett and J. J. Norman never was recorded, the defendant E. G. Norman can not claim, that he was a purchaser without notice, because it appears, that James J. Norman resided on the 150 acre tract of land until the time of his death, and, although one of the witnesses states, that he died in 1864 or 1865, he was living at the date of said agreement between J. M. Bennett and E. G. Norman; for the agreement recites, that said James J. Norman claims, that on the 18th day of September, 1848, he purchased said land from J. M. Bennett through his agent, and that James J. Norman is insolvent, and the land must be sold for the supposed purchase-money, or be canceled; and Jasper Norman, a son of said James J. Norman, states in his deposition that said E. G. Norman "was at his father's house several times during his lifetime, and had dealings with him up to the time of his death." See the case of *Campbell* v. *Fetterman's Heirs*, 20 W. Va. 399, 6th point of syllabus,

where this Court holds that "a person in possession of real estate is sufficient notice to a purchaser contracting with a claiment of such real estate not in possession, to put him on the enquiry, and, if he takes a conveyance from such claimant, he will be charged in favor of the person so in possession with all the information such enquiry would have given him if diligently pursued." See also *Manufacturing Co.* v. *Coal Co.*, 21st point of syllabus, 8 W. Va. 409, and *Frame* v. *Frame, supra* p—— (9. S. E. R. 901.)

The next question for consideration is: Does said written contract possess that degree of certainty, required in contracts of this character, in order that they may be specifically enforced in a court of equity? This Court in the case of *Mathews* v. *Jarrett*, 20 W. Va. 422, uses the following language: "It is an elementary principle that a contract which a court of equity will specifically enforce must be certain as well as fair in its term; and the certainty required has reference both to the description of the property and the estate to be conveyed. Uncertainty as to either, not capable of being removed by extrinsic evidence, is fatal to any suit for a specific performance," and such extrinsic evidence, the court further says, is strictly confined in cases, where no fraud, mistake or other equitable incident of a similar character is alleged, to the function of explanation and of exhibiting the surrounding circumstances, *etc.*

In this case the agent of Bennett went upon the land in pursuance of the contract and surveyed and marked it; and the surveyor in making his report directed in this case speaks of a corner made by Thomas Marshall for J. J. Norman; and J. M. Bennett in the written contract made with E. G. Norman on the 6th of November, 1865, mentions that J. J. Norman claims, that he purchased the tract of land, on which he then resided near the 300 acre tract through Bennett's agent for $150.00; said J. J. Norman had been living on said land and claiming it as his own and making improvements on it for nearly seventeen years; said Bennett had ratified the acts of his agent Marshall by receiving all of the purchase-money but $30.00. When said tract of land was actually run off to James J. Norman does not appear, but Milton Norris says in his deposition, that he had

run a part of the lower line as early as 1855, and since the war he ran around the entire tract and found the original lines. It must be presumed, that this land was run off to said James J. Norman by Marshall about the time the agreement was made, and Norman took possession of the land then pointed out and designated by Bennett through his agent, Marshall, and after said tract of land was so laid off and accepted by James J. Norman, the survey became a part of the contract, and Norman could not claim beyond its limits; neither could Bennett as the owner of the 766 acre tract, of which said 150 acres were originally a part, claim any portion of the boundary so separated form the larger tract.

Another circumstance of importance in this case is, the fact that in August, 1852,—about four years after the contract was made,—J. M. Bennett receipted to James J. Norman for $120.00 in notes on said James Long, which, when collected, he agreed to apply as a credit on the bond executed to him by said Norman for a piece of land on Steer run, a branch of the left-hand fork of Steer creek; and when, in 1865, he sold the same tract to E. G. Norman, it seems that he easily found it, because several of the witnesses state, that at the time, when their depositions were taken E. G. Norman was occupying the tract formerly occupied by J. J. Norman.

In the case of *Creigh's Adm'r* v. *Boggs*, 19 W. Va. 240, this Court held: "Either party to a written contract for the sale of land may have the same specifically enforced in a court of equity with such corrections in it, as parol proof may show to be necessary to correct a mistake made in reducing the contract to writing;" also "When the mistake was made, not in reducing the contract to writing, but in the supposition of both parties that the boundaries of the land named in the contract would include a certain mill-site, and, on discovering that it did not, the parties agree by parol to so change the boundaries as to include the mill-site, and under their direction the surveyor makes a plat and report of the land according to these boundaries, and the vendor brings a suit to enforce the contract with this alteration, and the defendant in his answer admits this mistake of the parties and its correction, producing the

corrected boundaries and plat, but resists the execution of the contract, relying on the statute of frauds, the court will nevertheless specifically enforce such written contract as modified by the parties to correct such mistake."

Instead of changing and altering the boundaries by parol as in the last-named case the parties to the agreement in this case actually ran off and surveyed the entire boundary, and the vendee by parol accepted the entire boundary as surveyed and designated by the vendor acting by his agent and was given a plat of the same, which the evidence of Levi Boggs shows was in the hands of said Norman's widow, which plat showed, that the survey contained 149 acres. It seems to me, that, if a contract in writing in reference to boundaries may be modified and changed by parol, where the written contract provides for the shape of the tract and its locality, extrinsic evidence may be introduced to show, that the land was surveyed by the vendor on the waters designated in the agreement and in the shape therein provided for, and was accepted by the vendee.

Upon the hearing of the cause the court below being of opinion, that proof of the declarations of J. J. Norman in his lifetime as to the location, lines and corners of the tract of land claimed by the plaintiffs could not be received and read to identify said tract of land, and that there was not sufficient proof of the location and identity thereof on the part of the plaintiffs, dismissed the bill, amended bill and bill of revivor with costs. But the evidence of said J. J. Norman was immaterial in support of his claim, as there was other evidence sufficient to identify said 150 acre tract of land. In the case of *Westfall* v. *Cottrills*, 24 W. Va. 763, which was a suit for specific performance, in which there was a parol contract for the sale of land, in which Cottrills agreed to convey to the plaintiff forty acres of land out of a tract of about 147 acres, which he then owned in said county, situate on Beech Fork, the said forty acres to be run off from the Spring Fork end of said 147 acre tract, that being the upper end thereof, this Court denied specific performance, holding that " in a suit for the specific execution of a parol contract for the purchase of land, where neither the contract nor proof identifies or defines the tract or bound-

aries of the land, nor refers to anything by which it may be identified with reasonable certainty, the Court will dismiss the bill." That was a very different case from the one under consideration. There was no proof in that case of the identity and locality of the land ; here the proof is full showing that the vendor through his agent marked and designated the land.

The defendant, Bennett, in his answer to the amended bill admits, that the title-bond bearing date on the 18th day of September, 1848, was treated as ratified, but alleges, that the 150 acres therein described was part of 300 acres, which was sold to J. J. Norman under a decree of the Circuit Court. In this Bennett is clearly mistaken, as is shown by reference to the title-bond filed as Exhibit 1 with plaintiff's amended bill, which mentions no other land than the 150 acre tract, which appears to have been sold without reference to any other tract, for the consideration of one dollar per acre, while the decree directing the sale of the 300 acre tract on the 31st day of May, 1866, discloses the fact, that the purchase-money then amounted to $529.89, with a considerable amount of interest to be added. Bennett, having admitted in his answer, that he ratified said agreement made by his attorney in fact, Thomas Marshall, and having received nearly all of the purchase-money, after the boundary lines of said taact had been surveyed and marked, and after Norman had been in possession of the same for about four years, and having allowed Norman to remain in possession, cultivate and improve said lands until his death, in 1865, a period of about seventeen years, and during all that time having asserted no claim to said land, and immediately after the death of J. J. Norman, to wit, on the 17th day of September, 1866, having conveyed said land to E. G. Norman, and this suit having been instituted and the bill filed at June rules, 1875, not quite nine years after said deed was made to E. G. Norman, the plea of the statute of limitations relied on by the defendants can not avail them.

I am therefore of opinion, that the agreement entered into by J. M. Bennett, evidenced by the title-bond bearing date on the 18th day of September, 1848, under which said J. J. Norman took possession of the land, paid a large part of the

purchase-money, and occupied it and claimed it as his own during his whole life, should be specifically enforced; and it appearing, that E. G. Norman took a conveyance from said J. M. Bennett on the 17th day of September, 1866, for 187 acres, 1 rood, and 25 poles of land, which conveyance included the 150 acre tract sold to James J. Norman, with full notice of the possession, right and claims of James J. Norman's estate thereto, said conveyance to said Elijah G. Norman should be set aside as to said 150 acre tract included within the boundaries of said 187 acres, 1 rood, and 25 poles; and upon the payment of the residue of the purchase-money remaining unpaid upon said 150 acre tract, with its accrued interest by the heirs at law of James J. Norman a deed should be directed to be made to them for said 150 acre tract of land.

The decree of the Circuit Court below dismissing the plaintiff's bill, amended bill and bill of revivor must be reversed, and this cause is remanded to the Circuit Court of Gilmer county for further proceedings to be had therein, and the costs of this appeal must be paid by the appellees.

REVERSED. REMANDED