# CHARLESTON.

### SCOTT & WOODRUFF v. HUGHES.

Submitted June 5, 1909. Decided December 21, 1909.

1. EXCEPTIONS, BILL OF—*Signing—Time—Termination of Term.*
   If a vacation order by a judge does not show that a bill of exceptions was signed within thirty days after the close of the term at which judgment was rendered, the court will read the order of the circuit court showing the date of the close of the term. (p. 574).

2. MINES AND MINERALS—*Contracts—Assignment—Breach—Assignee's Liability.*
   Under the agreement involved in this case it was not the binding duty of Scott & Woodruff to remove liens, but Hughes had the right to do so, out of purchase money in his hands going to the land owners, if they would consent, and if they would not, then to remove the liens out of money in his hands going to the landowners and charge it to them, and Hughes failing to do so, and letting the options lapse from time, Hughes must answer to Scott & Woodruff for the amount stipulated to be paid them by Hughes. (p. 577).

3.   APPEAL AND ERROR—*Rulings on Evidence—Prejudice.*
      The admission of improper evidence is not cause for reversal
   if it is immaterial in the decision of the case.   (p. 581).

Error to Circuit Court, Marshall Count.

*Assumpsit* by Scott & Woodruff against G. Charles Hughes. Judgment for plaintiffs, and defendant brings error.

*Affirmed.*

*S. Bruce Hall* and *Simpson & Showacre,* for plaintiff in error.

*C. C. Newman* and *McCamic & Clarke,* for defendants in error.

BRANNON, JUDGE:

A preliminary question arises. It is contended that the evidence and facts in this case cannot be considered for want of bills of exceptions. One ground of this claim is that the order of the judge in vacation showing the execution of the bills of exceptions, does not on its face show that the bills were made within thirty days after the close of the term of court. A *certiorari* has brought to us a copy of the order of the court showing the date of the adjournment, and this brings the execution of the bills of exceptions within the thirty days. But the position of counsel is that we cannot use this order for this purpose. It is argued that that order is not a part of the record in this case, and that we cannot go outside of the record of this particular case, and if we cannot find from the face of this vacation order that it was within time, the bills are lost. Much authority is cited for this position, we must confess. *Justices v. Barrington,* 6 Ga. 578; *Davis v. Iron Co.,* 143 Ind. 142, and other cases. But we think this is very technical. When the judge has certified that the bill was signed, but has omitted to state the close of the term, it would be hard to make the party lose the benefit of his exception from the accidental omission of the judge to show in his certificate the date of the close of the term, or to state that the bill was signed within thirty days of the close of the term. The certificate ought to do one or the other. Our practice has not in the past conformed to the rule which counsel would impress upon us by authorities from other states. We have heretofore supplied this deficiency by sending

for the order closing the term and we see no reason to depart from our usage in this respect.

The certificate of the judge says that the first bill "includes all the evidence taken upon the trial of the above entitled case together with the exhibits filed therein, and the second contains the instructions". Turning to them we find the documents called exhibits to be shown in the second bill of exceptions, not in the first, as the Judge's order states; but in giving these exhibits in the second bill of exceptions we are referred to the pages of the first bill of exceptions where those exhibits are introduced. Thus in a sense these exhibits are referred to in the first bill of exceptions. But we read both bills together, and so those exhibits be found in either they are parts of the record.

R. T. Parsons, T. I. Pyles and D. F. Mason each executed to F. V. Yoho contracts known as options giving Yoho right to purchase by a certain time the coal in three separate tracts of land owned severally by Parsons, Pyles and Mason. These option contracts came by assignment to the ownership of Scott & Woodruff, as partners. Scott & Woodruff made a written contract with G. Charles Hughes, 5th January, 1906, by which they did "transfer, assign and set over unto the said party of the second part (Hughes) all their right, title, interest, claim and demand in and to the following enumerated agreements", specifying a number of options, among them the three named above. The said contract between Scott & Woodruff and Hughes provided that Hughes should pay, as a consideration for such assignment of the options, the difference between the purchase money going to the landowners by the options and twenty-three dollars per acre, "said difference being the amount to be paid as titles to the coal are secured under the agreements of purchase hereby transferred." The said agreement contained these further provisions: "The parties of the first part agree on their part as follows: (1) To endeavor to secure at their own expense the said agreements to be acknowledged for record by the parties therein. (2) To procure and deliver acceptances either duly signed by the parties, or legally served on the parties for such agreements as now appear on their face to need same. (3) In the event that title fails to any agreement or agreements herein transferred, or becomes involved in legal troubles

so that the coal cannot be secured thereunder, the said parties of the first part agree on their part to release said party of the second part from payment of the commissions herein agreed to be paid on the tracts for which the coal is not secured, and also agree in that event that the proportionate amount of the cash payment this day made and receipted for herein on the tracts for which the coal is not secured, shall be applied as a credit on the amount to become due under this agreement, and be deducted therefrom. And it is hereby further understood and agreed by and between the parties hereto that no commission shall be lost to the parties of the first part by reason of any default or neglect by the party of the second part." The options assigned by Scott & Woodruff to Hughes provided that the landowners "agree to sell and convey to the said party of the second part, in fee by general warranty deed, and clear of incumbrances and defects of title, all the coal underlying that certain tract of land", describing the tracts. Hughes did not take up the land under these options; that is, he took no deeds, but let the options lapse from time, and Scott & Woodruff brought an action of *assumpsit* in the circuit court of Marshall county against Hughes to recover from Hughes the difference between the amount to which the tracts would come in money and the sums payable to the landowners under the options. The case was tried by a jury and resulted in a verdict and judgment in favor of Scott & Woodruff for the full amount claimed by them. Hughes sued out a writ of error.

Hughes seeks to defend on the theory that there were certain liens incumbering the land, one a deed of trust, one a vendor's lien and the other a decree lien. He says that before Scott & Woodruff could demand their money under the contract assigning the options to him those liens must have been removed. This involves the construction of the contract between Scott & Woodruff and Hughes. Hughes was to pay the landowners. Was it the duty of Scott & Woodruff to remove these liens before they could demand that Hughes take up the lands under the options and pay them their money? The court is of the opinion that the effect of the transaction between Hughes and Scott & Woodruff is that Scott & Woodruff sold to Hughes only mere options, the right and power to carry out the options; that the assign-

ment deprived Scott & Woodruff of power to get deeds or to enforce the options and placed such power solely in Hughes. The court thinks that by the contract Scott & Woodruff took upon themselves only the duty to get the landowners to acknowledge the options and to procure acceptances from the landowners of notice that Hughes exercised the option to take the land, or serve notice thereof on the landowners; and that beyond that the contract placed no duty upon Scott & Woodruff; that it was the duty of Hughes to get deeds from the landowners, as the power to do so, after the assignment, was vested in him only, and Scott & Woodruff could no longer enforce the options, they having parted with the options and vested all rights and powers under them in Hughes. The court thinks it was not the duty of Scott & Woodruff to remove those liens or advance money to do so. The court thinks that as Hughes had money in his hands to pay the landowners for the land, it was his duty to obtain from them deeds, deducting from the purchase money the incumbrances, if the landowners consented, and if they did not, then Hughes must nevertheless take deeds, and then pay off and retain the liens out of money going to the landowners under the contract of assignment. Scott & Woodruff did not make a general warranty of the land, did not covenant to warrant it. They did agree that if any of the land should be lost by superior title they would abate from the money going to them that proportion attributable to the tract so lost. I repeat the duty of Hughes was to get deeds and deduct from the landowners, if they consented, incumbrances, or if they would not consent, still to take deeds and retain the incumbrances out of the money going to them. Hughes had in his pocket the means of clearing the titles of the incumbrances. In this connection it is appropriate to call attention to that provision of the contract found above that, "no commission shall be lost to the said parties of the first part by reason of any default or neglect of the party of the second part." As the duty of obtaining deeds and removing incumbrances rested upon Hughes his failure to do so, under that clause, would forbid his denial of commission to Scott & Woodruff. Hughes had the means of removing the incumbrances and should have done so with the money in his hands; this being so it was a duty resting upon him to do so

by the letter of the contract, and his failure to do so negligence and default and cannot excuse him from paying Scott & Woodruff. It is argued for Hughes that those options are made a part of the assignment contract between Scott & Woodruff and Hughes; that the provision in those options that the optionee should be entitled to a general warranty deed free of incumbrances and defect of title is in effect a stipulation by Scott & Woodruff, that only upon the conveyance of a clear title free of incumbrances should they demand their "commission"; that Hughes took the shoes of Yoho, the original optionee, and could demand of the landowners clear title, free of incumbrances, and that Scott & Woodruff bore to Hughes the relation of the landowners to the original optionee, Yoho, and would not be compelled to pay their commission, without getting clear right; but in this this Court does not concur. If the land were lost by superior title, we should not so hold, because that would not be the mere removal of an incumbrance with means in the pocket of Hughes to enable him to do so. But there is no claim of any loss or danger of loss from hostile title. The only defects alleged are liens. Likewise it may be that if it were a question merely between optioner and optionee, the principle above stated would not apply; but the circumstances of this case differentiate it from those instances, in the fact that Scott & Woodruff sold Hughes a mere option to purchase, a mere power to purchase, and left in his hands a fund with which to protect himself, and not having exercised that right of such protection, having neglected to do so, he is by the above clause in the contract, and perhaps without it, debarred from refusing to pay Scott & Woodruff their commission. This is not the case of vendor and vendee. Doubtless Scott & Woodruff could have removed the liens, and have credit therefor; but they were not compelled to do so, and could not enforce the land owners to convey. That power was vested in Hughes only; Scott & Woodruff had no longer title on which to enforce specific performance by the landowners. I am clear in affirming the judgment on other considerations also. It does appear that there was no danger from the liens. No question of defect of title is even hinted. As to the liens. One was a deed of trust to secure eight notes aggregating $1,100, the trust showing on its

face that six of them aggregating $950 had been assigned to W. V. Hoge, and two held by Suter, together $150. A release was recorded good as to Hoge, but defective as to Suter for want of his signature. Suter . acknowledged it as shown by the justice. It was not shown by Hughes that a single dollar remained unpaid to Suter. Indeed, the fact that he acknowledged it leads us to the conviction that he had been paid. We may safely say that the evidence of the justice and other evidence could be produced to show that Suter had been paid. It does not appear that Hughes or his attorney made any investigation as to this.

As to another lien, one for purchase money on one of the tracts. A release of it was recorded. Wayt, the owner of this lien, assigned it and the assignee executed a release recorded in 1903, but the assignment was not recorded until April, 1906, after the date of the assignment of Scott & Woodruff to Hughes, and after the expiration date of the options. Because such assignment was not recorded until after the expiration date, Hughes would say that he could not tell that the assignee of this debt, who made the release, was its owner. But here we have evidence clearly showing the payment and release of this lien. Hughes was in no danger from it. Did he or his attorney ever take a step or ask a question of Wayt as to the continued existence of this lien which had long before been released? No inquiry whatever as to this was made by Hughes or his counsel at sources open to them. Put upon inquiry, was it not the duty of Hughes to make some investigation by seeking Wayt? It was his duty to do something in this matter.

The third lien on another tract was because of a decree of partition imposing on this tract one seventh of the cost of partition. A small matter at best. It does not appear that it was docketed in the lien docket so as to affect Hughes. It dates back to January, 1891, affording the fair presumption that it had been discharged. No investigation as to this was made by Hughes. Nothing to show that this little part of he costs remained unpaid. So, these liens afforded no impediment to Hughes getting good title, and we are clear from all the evidence that the lands were really clear of liens.

But this is not all. The landowners were ready to make

deeds. Two of them tendered deeds. Another went to Hughes' attorney stating that he was ready to make the deed, and asked for his money, and was informed by the attorney that he had no money with which to pay. The land lies in Wetzel county where the landowners and the attorney who represented Hughes reside. There the money was payable on delivery there of deeds. Hughes demanded that the landowners make deeds and send them accompanied by a draft for the purchase money to Waynesburg, Pa. The landowners were not willing to do this. They were entitled to be paid money in Wetzel county, and could not be required to run the risk of sending deeds away. They had the right to refuse to do so, as there was nothing in the contract requiring it, as Hughes himself admits. He gives some evidence that he wanted an attorney at Waynesburg to examine the deeds. That makes no difference. He had his attorney in Wetzel county, and he reported to Hughes as to the titles. The options required the landowners to furnish abstracts of title and they were furnished, and required the optionee to settle, that is pay, within twenty days. On the stand Hughes was asked why he did not attempt to comply with that requirement. His answer was, "I did when I asked them to send their papers and abstracts that they might be settled." He was asked if that is the only way in which he attempted to comply with his contract. His answer was "I settled with the others in that way." This meant as to other tracts. Virtually and substantially Hughes himself gives as an excuse for his failure to pay for the land the fact that the landowners were not willing to send their deeds off to Pennsylvania. He admits that he had no right to make such demand. Hughes' attorney in Wetzel county examined the titles and approved them, and after such approval it was that Hughes asked that the deeds be sent to Pennsylvania. Now, that very request shows that he accepted the title as good. Again, after these landowners had tendered deeds, which were not accepted and paid for, it seems that they did not regard themselves further bound. Then Hughes after his default wanted to bring suit against them to enforce deeds, he says. Why did he want to enforce specific performance if he regarded the title insecure? The truth is Hughes never regarded these lands endangered by these liens. He never went to the land owners

or plaintiffs to ask them to clear them up. At the trial of this case the burden was on Hughes to show bad title or incumbrances. He did not do so. It appears to us that the titles were safe from these alleged liens. So much so that the court would have been justifiable in directing a verdict for the plaintiff. It only adds to this position to say that Hughes must have regarded the title to the Parsons land good because he sold it to one Patterson and got the money for it.

An assignment of error largely relied on in this case is that the court permitted lawyers who had examined the titles, to give their opinions that the titles were good. It is hardly necessary to say that all the authorities say that valid title cannot be proven by the opinion of anybody, attorney or not. *Parks* v. *Morris, Layfield & Co.,* 63 W. Va. 51; 4 Wigmore on Ev., section 2556; 5 Ency. Evidence, 568. But that rule does not apply here, if we are correct in the position above stated. As it was the duty of Hughes, if he wanted the land, to use the money in his pocket to relieve it of liens, the question of title is immaterial. It is not a question of title but of liens. Though we concede that liens existed, what matters it that evidence was received of opinion to prove that the land was in no danger from them, when Hughes could and should have removed them? These witnesses declare the title good, or rather there being no question of title but simply of incumbrances, even if we say that there was danger in fact from incumbrances, that would be immaterial, as Hughes could have removed them. The fact that this evidence is under the circumstances immaterial, it is not cause for reversal. Another reason why this evidence is immaterial is that there was no issue as to title before the jury. Nothing at all to show bad title. The burden was on Hughes to show bad *title;* but he made no showing. Then, how could this evidence influence the jury? It is immaterial; could have no force. And even though there were liens, Hughes must use the money in his hands to remove them. So, in every view this evidence is not material.

Another reason why we will not reverse because of this evidence is, that we cannot realize that it could have affected the verdict. Outside of the duty of Hughes to apply the money to remove the liens, if they existed, we say that the evidence

plainly shows that there were no liens endangering the land; the evidence does not show endangering incumbrances. It plainly appears that Hughes would have got secure right to the land; so plainly is it shown that we say that the court would have been entirely justified, on this ground alone, in directing a verdict for the plaintiff, or in setting aside a verdict for the defendant, had one been rendered. -

I have not detailed all evidentiary matters. I have several times said that our reports are filled with mere statements of evidence; that the intention of decisions is to lay down principles of law upon the ultimate facts, not to detail mere evidentiary facts, which will likely hardly ever be exactly identical in other cases.

If the principle above stated be correct, then the two instructions given for the plaintiffs are free of error, and instructions refused the defendant were properly refused. We need not incorporate or further refer to the instructions, because the principles of law applicable to the case have been above stated. The brief of counsel for the defendant does not discuss these instructions. It discusses some principles applicable to the case, recognizing that a settlement of these principles would answer the instructions.

Our conclusion is to affirm the judgment.

*Affirmed.*