# CHARLESTON.

ARMSTRONG *et al. v.* MARYLAND COAL CO. *et als.*

## Decided February 22, 1910.

1.  SPECIFIC PERFORMANCE—*Unilatral Contracts—Contract for Sale of Land Signed Only by Purchaser.*

    As an exception to the general rule, a contract for the sale of land, signed by the vendee only, may in a proper case be specifically enforced at the suit of the vendor.

2.  FRAUDS, STATUTE OF—*Authority of Agent to Sell Land—Necessity for Writing.*

    If an agent be authorized to sell land it is not necessary that his authority to sell be in writing.

3.  MINES AND MINERALS—*Sales.*

    If the principal in ratifying and approving a contract by his agent, for the sale and purchase of a certain vein or stratum of coal and mining rights, modify the terms thereof, and with knowledge thereof, the vendee finally accepts the contract without objection thereto he will be regarded as having acceded to the modification and will be bound by the contract as modified.

4.  SPECIFIC PERFORMANCE—*Option Contracts—Construction.*

    An option contract for the sale and purchase of a certain vein or stratum of coal and mining rights, calling for final acceptance by a day specified, gave the vendee the right thereafter to arbitrarily object to the quality of the coal, the character or location of the surface, or to any title or conveyance, or to the terms of mining rights, and if the vendors were unable or unwilling to remove the same, the right to either party to rescind the sale. *Held,* that after such final acceptance by the vendee, investigation of the coal, coal beds, surface and mining rights, and final election to take the property agreeably to the terms of the contract, and calling for abstract of title, deed, etc., the vendee thereby waived the right to interpose any such arbitrary objection, and that upon tender of abstracts of title and deed giving good title and reasonable and adequate mining rights, the vendor was entitled to specific execution of the contract.

5.  SAME—*Mutuality of Contract for Sale of Land.*

    Where at the time of the contract for the sale and purchase of land the purchaser has knowledge of the location of the title, and that the vendor is not the owner, but represents the owner as agent, and depends for performance of the contract on procuring the deed, the ratification and approval of the owners; and

with the further knowledge that the vendor has procured such ratification, and that he and his principals are proceeding in good faith in the performance of the contract, there is no such lack of mutuality of contract as will excuse specific performance thereof by the vendee.

6. SAME—*Contract for Sale of Mining Rights.*

When the vendee in such an option contract for the sale and purchase of coal and mining rights, after investigation of the character of the coal and mining rights as contemplated by the contract, notified the vendor in writing of his final election to take the property, waiving thereby the right to make such arbitrary objections thereto, and the right to rescind and cancel the contract, specific execution of the contract by him may be decreed, if the vendor, at the time when by the contract or the equity of the case he is required to do so, is able to convey a good title to the coal, and tenders a deed, granting the same and at least reasonable and adequate mining rights, specific performance. of the contract will be decreed, though the mining rights owned and appertaining to the coal under each tract described be not in all respects uniform.

7. MINES AND MINERALS—*Contract for Sale of Mining Rights— Rights of Purchaser.*

Where under such a contract the purchaser with knowledge of the character of the mining rights which the vendor owns and is able to convey finally elects to take the property, and said mining rights are reasonably adequate for the purposes of mining and removing the coal conveyed, and from co-terminous tracts, the purchaser may not, as a condition precedent to the execution of the contract, demand as mining rights the right to remove over, through and under the lands in which the coal conveyed is situated coal thereafter acquired by the purchaser; the right to make and maintain all necessary and desirable dumps, air-ways, haulage ways, and drain-ways through and upon the surface of the land *and every part thereof;* a covenant against liability for subsidence. or injuries occasioned by mining, removing, coking, manufacturing or carrying away the coal or products thereof; the grant of a perpetual easement of support and maintenance of support of the coal vein or stratum conveyed in its then natural condition or position; a covenant that in mining for oil or gas, wells shall not be drilled except through the solid coal conveyed, and upon condition that the purchaser, his heirs or assigns, shall be first paid a fair price for the coal, not less than one hundred feet square necessary to protect each well, the law of the contract giving and protecting the purchaser in all such rights which under the contract he is entitled to demand.

8. VENDOR AND PURCHASER—*Contract for Sale of Land—Incum-brance Readily Removable.*

    A mere incumbrance on real estate which may readily be re-moved and discharged out of the purchase money is not a bar to specific execution of a contract for the sale and conveyance thereof.

9. SPECIFIC PERFORMANCE—*Contract to Sell Land—Right of Vendor —Ability to Convey Title.*

    If a vendor is able to make the stipulated title at the time when by the terms of his contract, or by the equities of the par-ticular case, he is required to make conveyance, in order to en-title himself to the consideration, this is sufficient to entitle him to specific execution, though he may not have been in a situa-tion to perform the contract literally at the time he brought his suit.

10. APPEAL AND ERROR—*Proceedings—Right to Title Reference.*

    Though in a suit for specific performance, the general rule is that if there be doubt as to the title, or defendant request it, the court should order a title reference, nevertheless if the par-ties have taken all their evidence and submitted the cause to the court for final adjudication, without motion or request for such reference until after the court has pronounced its decision, and the facts proven are sufficient to show *prima facie* a good title in the plaintiff, the decree below will not be reversed here for alleged error in overruling defendant's motion for such title reference, the motion then being too late.

11. DEPOSITIONS—*Exceptions—Waiver.*

    Exceptions to depositions recorded by the officer taking the same will, as a general rule, be regarded as waived, unless brought to the attention of the court at the hearing and the ruling of the court obtained thereon, and unless the evidence excepted to be wholly incompetent it may be given such pro-bative effect as without such objections it may be legally en-titled to have.

12. VENDOR AND PURCHASER—*Contract to Convey Mineral Rights— Rights of Vendor to Interest.*

    Where by the terms of a contract for the sale and purchase of a certain vein or stratum of coal, and mining rights, the pur-chaser is not let into possession of the property, except to make preliminary investigations and tests, and is not authorized to mine or operate the property except upon compliance with all the terms of the contract, by paying the purchase money and obtaining a deed, and by the terms of the contract the purchase money is payable only upon a tender of the deed, the purchaser is not in a suit against hom for specific performance chargeable

with interest on the principal of the purchase money except from the time of the tender of a proper deed for the property.

13. SAME—*Conveyance.*
   An agreement by co-tenants to convey land by good and sufficient warranty deed, does not require either to warrant the title of the others. It is complied with if each makes a separate deed for his moiety, or if all join in a deed in which each grantor warrants his share but not that of his co-grantors.

14. SPECIFIC PERFORMANCE—*Parties.*
   Where a vendor in his life time brings suit for specific performance of a contract for the sale of land, and tenders with his bill, or in the cause and pending the suit, his deed in execution of the contract, and dies before decree his heirs are not necessary parties to a valid decree of specific performance and delivery of the deed thus tendered, the deed of the vendor being sufficient to pass the title of the grantor, relating back to the date of such tender.

(ROBINSON, PRESIDENT, Absent.)

Appeal from Circuit Court, Taylor County.

Action by Adolphus Armstrong and others against the Maryland Coal Company and others. Judgment for plaintiffs, and defendants appeal.

*Modified and Affirmed.*

*Brown, Jackson & Knight* and *Wm. E. Walsh,* for appellants.

*Davis & Davis, O. E. Swartz* and *G. H. A. Kunst,* for appellees.

MILLER, JUDGE:

The executory contract, specific execution of which by the Maryland Coal Company is sought by the bill, is covered: First, by the original or option contract of January 21st, 1903, as modified and indorsed thereon January 31st, 1903, executed by Reefer & Thorn, co-partners, and W. P. Goff and J. W. Brown, as individuals, but in fact as agents for plaintiffs and John T. McGraw, and calling for final acceptance on or before February 8th, 1903; second, by the so called acceptance contract executed by the defendant company, by J. E. Knapp, president, under its corporate seal; third, by a telegram from W. E. Walsh, attorney for defendant, to W. P. Goff, May 16th, 1903, and followed by duplicate letters dated May 19th, 1903, addressed by defendant company

to J. H. Kunst, Reefer & Thorn, and J. W. Brown, respectively, as follows: "We hereby confirm our final election,—communicated to you and others concerned in Col. McGraw's office at Grafton and telegraphed to Dr. W. P. Goff by Mr. W. E. Walsh, attorney, on last Saturday evening, sixteenth instant,—to take the John T. McGraw and the Armstrong and Kunst properties, agreeably to the agreement of January 21st last, signed by W. P. Goff, Reefer & Thorne, and J. W. Brown. As we are anxious to have the purchase completed, and property transferred, so as to get to work on it, we shall be much obliged if you will kindly hurry forward all that remains to be done upon your part, particularly the furnishing of abstracts of titles, for which Mr. Walsh is waiting." And fourth, and lastly, by the following communication dated February 7th, 1903, addressed to said Reefer by plaintiffs Adolphus Armstrong and John H. Kunst: "Referring to your contract with Frank C. Brackett, dated January 21st, 1903, providing for the conditional sale of our coal and mining rights designated therein as the Armstrong & Kunst tract of about twelve (1200) acres of the Pittsburg vein, north side of the B. & O. R. R. near Simpson Station, in Taylor county, W. Va. we hereby agree to confirm the same upon the payment to us for Two hundred & Fifteen (215) dollars per acre for said coal and mining rights thereto belonging as set forth in said contract,—to be cash if so desired by us. We to have sixty dollars per acre for twenty-six (26) acres of land adjoining said coal and the Sand Lick R. R.—nearest to the B. & O. R. R."

On February 15th, 1903, Brown by letter advised Walsh, defendant's attorney, of the confirmation of the contract by Armstrong and Kunst, and that they, himself and others, were then in a position to carry out their contract with the coal company. There is no doubt, therefore, that the coal company and Knapp, its president, as well as Walsh, its attorney, were fully advised of the relationship of Armstrong and Kunst to the contract, prior to the final election of the coal company of May 16, 1903, and confirmation thereof of May 19th, 1903 to take the property. If not, why did it notify them thereof, and thereafter conduct their negotiations directly with them for final consummation of the purchase?

On bill, answers, and proofs taken, the court below, February, 12th, 1908, pronounced the decree appealed from, overruling appellant's motion for a title reference, and for a survey, and adjudging that it pay plaintiffs, A. E. N. Means, curator of the estate of Adolphus Armstrong, deceased, John H. A. Kunst, in his own right, and as executor of the last will and testament of George H. A. Kunst, deceased, Elonora Batson, Louisa Kunst, Charles F. W. Kunst, Albert H. Kunst and Amelia Kunst, the sum of $293,375.28, the purchase money agreed to be paid plaintiffs with interest from August 22nd, 1903, to the date of said decree; and also to its co-defendants Brown, Reefer, Goff and Thorn, the sum of $13,563.95, the residue of the purchase money agreed to be paid them, with interest thereon from August 22nd, 1903, to the date of said decree; the right being reserved therein to defendant company, however, to pay to Albert B. Batson, executor, the sum of $2029.33, principal and interest of a purchase money lien on one of the tracts purchased, out of the amount so decreed in favor of said plaintiffs, and for which it should have credit thereon; and also further adjudging, that upon the payment of the sums so decreed against it, the defendant should have leave to withdraw the deed of October 9th, 1905, executed by plaintiffs, and as the record shows, tendered with the deposition of G. H. A. Kunst, on May 4th, 1906. And further decreeing that if said sums so decreed, with interest and costs, should not be paid within thirty days from the rise of the court, that the commissioners thereby appointed should sell the property mentioned and described in the deed to the highest and best bidded for cash, as in said decree prescribed.

A clear comprehension of the important provisions of the contract in its several parts is essential to a proper disposition of the points of error relied upon. First, the original option contract contemplates a final acceptance on or before February 8th, 1903, and payment at the same time of $50,000, signifying such acceptance, the remainder to be paid on the completion of the survey, examination of the title and property, and tender of a proper deed. But in what respect was this acceptance to be final? Certainly not in the sense of being irrevocable, for by other provisions circumstances and conditions are anticipated under which either party may rescind. It provides that should the coal company thereafter insist on any objection to the quality

of the coal, the character of the coal beds, or to the character or location of the surface, or to any title or conveyance, or to the terms of mining rights, 'which the vendors should be unable or unwilling to remove or comply with, then either party should have the right to rescind the sale altogether, in which event the payments made should be repaid to the coal company; and said contract by the last paragraph specifically stipulates that these payments were to be made "subject to the final consummation of the sale", as therein stipulated.

This contract amounted to no more than a mere offer to sell, and even after the final acceptance called for, it still left the coal company free if its objections, whether reasonable or not, were not complied with, to rescind the contract.  After such objections the only way the coal company could be bound by its final acceptance 'was to literally remove such objections.  In this way and in this way alone, and by complying with their covenants to thereafter furnish abstracts of title, and to tender good and sufficient deed or deeds for the property, could the vendors have put themselves in a position to call for specific execution of the contract.

But the acceptance of the coal company of February 4th, 1903 was not the one contemplated by the contract.  For although the first paragraph says:  "This company hereby approves and ratifies the agreement"; and the second paragraph says:  "That, subject in every respect to the terms and provisions of said agreements, this company hereby accepts the said premises and agrees to purchase the same"; and the third paragraph refers to the $50,000 payment as "the acceptance payment mentioned in the said agreements", yet the fourth paragraph stipulates that its "acceptance presupposes, as a condition precedent to its becoming final and irrevocable, the full and satisfactory performance and observance" by the vendors, "and each of them, of all the undertakings and conditions contained in said agreements on their part to be kept, performed and observed", and reserves to itself not only the right to revoke and rescind its acceptance and receive back the payments made for any neglect, fault or failure on the part of any of the vendors or either of them in the premises, or upon the happening of any of the contingencies mentioned in or contemplated by said agreements, but *"for any cause or causes".* · This latter clause seems to enlarge

the rights of the coal company, and to limit the original contract and the terms of its acceptance thereof. But whatever be the effect of this modifying clause, the view we have taken of the case renders it unnecessary to decide.

The third is the part of the contract mainly relied upon by the plaintiffs, namely, the telegram of Walsh to Goff, and the confirmatory letters of May 19th, 1903. These considered in the light of the transactions and dealings between the plaintiffs and the coal company up to that time, it is affirmed, amounted to a waiver of all objections to the quality or character of coal, the character or location of the surface, or the title or mining rights of the plaintiffs, and rendered the contract thereafter irrevocable and subject to no other terms or conditions except the furnishing of abstracts of title and tender of deeds as stipulated therein.

Besides other important questions the pleadings and proofs present the following, affirmed by plaintiffs and denied by the defendant company: First, did the contract of January 21st, 1903, and its ratification by Adolphus Armstrong and John H. Kunst, constitute a continuing offer by plaintiffs to the defendant company to sell said coal and mining rights, and the land described in the deed approved by the final decree? Second, was the alleged final election or acceptance of May 19th, 1903, in fact final, or did it leave the coal company still free to recede therefrom for any cause? Third, was the contract void for lack of mutuality? Fourth, are the mining rights tendered by the plaintiffs by said deed so insufficient under the contract as to justify the court on refusing specific performance?

It is pertinent to note in this connection that the coal company, after obtaining the consent of Goff, Reefer, Thorn and Brown, elected to segregate the contract for the McGraw land and the railroad, and had prior to this suit finally consummated the contract with McGraw for his property, and had also concluded a satisfactory contract as to the Sand Lick Railroad, and car service, called for in the option; also that before and, after that time it had begun and continued its negotiations for plaintiffs lands and mining rights directly with Armstrong and Kunst, and as we have seen, had given notice to them of its acceptance of the property upon the terms of the contract, by their letters of May 19, 1903.

. Notwithstanding this status of the parties appellant in its

answer and in argument contends, that the contract of January 21st was not the contract of plaintiffs, binding them and constituting a continuing offer; that the ratification thereof by Armstrong and Kunst of February 7th, 1903, addressed to Reefer, and not to defendant company, and being subsequent in time to its acceptance of February 4th, 1903, the latter acceptance did not make a contract binding either the coal company, or Armstrong and Kunst, or plaintiffs, because not parties to the contract, and because the ratification of Armstrong and Kunst undertook to impose new terms and conditions not covered by the contract accepted, namely, that they were to have $60 per acre for 26 acres of land adjoining said coal, and that the residue of the purchase money if desired by them should be paid in cash, and not as the contract provided "to be paid, or satisfactorily arranged for on the completion of survey, examination of property and title, and tender of proper deed"; and that $215 per acre thereof should be paid to them, the remaining $10 per acre of course to go to Reefer, Thorn, Brown and Goff, in place of paying the whole price to the optionors as the contract provided. These positions are predicated mainly on the theory of want of agency, or authority of Goff, Reefer, Thorn and Brown.

Did these optionors represent plaintiffs? By the terms of their contract they proposed to sell what was commonly known as the Armstrong and Kunst property. This was some notice to defendant. But did they have authority? The bill alleges that they did. The defendant company in its answer does not deny this, but says that it does not know what the fact is. The fact of agency is seriously questioned by no one, and both Armstrong and Kunst testify that they subsequently ratified the contract. Kunst, as executor, by the will of his father, had authority to convey the property, with the consent of the plaintiffs as devisees, which had been given. Moreover, the evidence discloses many interviews and negotiations by the officers and agents of the defendant company directly with Armstrong and Kunst, representing themselves and the other plaintiffs, and there can be no doubt of the fact that defendant had full knowledge of such agency, if not from the beginning certainly at the time of its final election and confirmation of the contract in May, 1903. With such knowledge and notice how can defend-

ant company be heard to say that such election and confirmation did not make a binding contract? That defendant company recognized and treated said contract as one made with Armstrong and Kunst, and as segregated from its contract with McGraw as confirmed by the letter of Knapp, president, to Brackett, July 13th, 1903, in which among other things he says: "Although I propose to live up to the spirit and letter of our contract with Armstrong and Kunst, I am not nearly so anxious to secure that property as before McGraw came to terms."

But it is contended that the contract was not signed by or on behalf of plaintiffs so as to make it binding on them and enforceable against the defendant company, and the statute of frauds is relied upon. In our opinion there is nothing in this contention. If Armstrong and Kunst, representing themselves and the other plaintiffs, had not so ratified the contract, the contract would nevertheless bind the parties. A well recognized exception to the general rule is that a contract for the sale of land, signed only by the vendee may be specifically enforced at the suit of the vendor. Martindale on Conveyancing, section 6; Pomeroy on Contracts, section 170; *Wyeth* v. *Mahoney,* 32 Grat. 645; *Creigh's Adm'r.* v. *Boggs,* 19 W. Va. 240; *Bumgardner* v. *Leavitt,* 35 W. Va. 194. The signatures of neither principals nor agents were necessary to render the contract enforceable at the suit of the vendor. Neither was it necessary that the authority of the agents should have been in writing. *Yerby* v. *Grigsby,* 9 Leigh 387; *Conaway* v. *Sweeney,* 24 W. Va. 643; *Wyeth* v. *Mahoney, supra.*

We see little merit in the defense that the terms of the contract as accepted were modified by the subsequent ratification of Armstrong and Kunst of February 7th, 1903. It is clearly shown by allegation and proof that the coal company had been fully advised of these modifications, and that they had been the subject of correspondence and interview prior to its final acceptance of May 19th, 1903; and though that acceptance by its terms was "agreeably to the agreement of January 21st last", it could not have been intended thereby to ignore or repudiate the terms imposed by the ratification of Armstrong and Kunst. When this ratification was transmitted by Reefer to Walsh, attorney for defendant, his attention was especially called to these modi-

fications, and there is not a syllable of evidence showing any objection thereto. On the contrary it appears that all subsequent negotiations proceeded uninterruptedly, and that at no time or place did any officer, agent or representative of the coal company raise any question with the plaintiffs or with any one representing them respecting any of these provisions.

Next was the acceptance by defendant company of May 19th, 1903, final in fact? The telegram from Walsh, attorney, to Goff, three days previous, said: "we elect to take the McGraw and the Armstrong and Kunst properties"; the letter of May 19th, "we hereby confirm our final election,—communicated to you and others". True these communications say, "according to" or "agreeably to" the contract or agreement of January 21st, and it is insisted that by these terms of its acceptance the coal company waived none of the terms and conditions of the original contract, as accepted February 4th, 1903, including the right to interpose any or all of the objections which by that contract it was entitled to interpose.

Considered apart from anything that intervened between the date of its first, and its final acceptance of May 19th, it is evident that the coal company intended to be bound in a different way by the latter than by the former acceptance. The latter requested plaintiffs "to hurry forward all that remains to be done upon your part, particularly the furnishing of abstracts of title for which Mr. Walsh is waiting"; but we think it clearly appears from the papers and the intervening negotiations and transactions between the parties that defendant had in the meantime considered all objections which it might have interposed to the kind and quality of the coal, mining rights, and so forth, and being then pressed for a final answer it determined to waive them and to finally and unconditionally elect to take the property, agreeably to the terms of the contract, upon presentation of abstract of title and tender of proper deed or deeds. True this no doubt implied further investigation of the title; but if the plaintiffs should present a good title, and tender a good deed, the defendant intended by its final election to be bound unconditionally to take the property. After defendant's final election, according to the evidence of Armstrong and Kunst, uncontradicted, Armstrong sent to Walsh abstracts of title, accompanied by deeds, and at least attempted to comply with all the demands

thereof. These Walsh retained without exceptions or objections until about the time defendant repudiated the contract, when they were left by somebody in Armstrong's office, followed by a letter objecting to the mining rights and making what was regarded onerous and impossible demands to be later considered. That defendant considered itself so unconditionally bound by its final election to take the property, is made somewhat manifest by a letter from Knapp, president, to Brackett, superintendent, written afterwards and about the time he concluded his company did not want plaintiff's property, in which he says: "I sincerely trust that, * * * * we are not so committed to the property that we will have to take it, whether we wish to do so or not." The money market had become disturbed, business somewhat depressed, and the coal market very weak, and as Knapp expressed it to Brackett in giving him his cue for future guidance, "The bloom seems to be off the rye." This all occurred after defendant had consummated the contract with McGraw for his property.

The next question is, is the contract void for want of mutuality? In affirming the proposition appellant relies upon the fact that Mrs. Batson, one of the plaintiffs, a daughter and devisee of George H. A. Kunst, deceased, was a married woman, and that as she and her husband are not shown to have executed and acknowledged the contract, it was not binding upon her—no mutuality of obligation, and hence specific performance thereof could not be enforced against it. The general rule in equity relied upon, that a contract to be specifically enforced must in general be mutual in its obligation and in its remedy, and must be so *ab initio,* is not controverted. But the reply of appellees is that the rule is only a general one, with many exceptions, within some of which, presently to be considered, the case in hand logically and properly falls. In support of its main proposition as to the personal incapacity of Mrs. Batson, a married woman, and that she and her husband had not signed the contract, appellant relies mainly upon the Virginia cases of *Shenandoah Valley R. R. Co.* v. *Dunlop,* 86 Va. 346; *Chilhowie Iron Co.* v. *Gardiner,* 79 Va. 305; *Cheatham* v. *Cheatham,* 81 Va. 395. The appellees are challenged to present any case in which a married woman has been permitted to sue for the specific

execution of a contract void as to her. A sufficient answer to the
argument based on these authorities we think is, that the cases
originated prior to the present statutes of Virginia, and at a
time when contracts of married women in general were void
and unenforceable. The law in Virginia is now otherwise and is
and was at the time of the contract involved here different in
this state: *Gentry* v. *Gentry*, 87 Va. 478 (12 S. E. 966);
*Virginia Coal & Iron Co.* v. *Roberson*, 88 Va. 116 (13 S. E.
350); chapter 66, Code West Virginia, 1906. The Virginia
statutes controlling the decisions in *Gentry* v. *Gentry*, and *Coal
& Iron Co.* v. *Roberson*, Code, sections 2286 and 2288 referred
to, are much broader and give a married woman much larger
powers with reference to her separate estate than is given by
chapter 66, of our Code. By section 2286 of the Virginia Code,
she may, by her sole act, convey or otherwise dispose of her
separate estate, as if she were unmarried. But by section 3 of
chapter 66 of our Code, though she may convey and devise her
separate estate in the same manner and with like effect as if
she were unmarried, yet, unless she be living separate and apart
from her husband, she may not sell or convey the same, unless
her husband join in the deed or other writing by which the same
is sold or conveyed. By the same section she may by power of
attorney duly executed, her husband joining therein, acknowl-
edged and certified, as prescribed, appoint an attorney in fact
for her and in her name to execute and acknowledge for record
any deed or other writing which she might acknowledge in
person. By section 13 of the same chapter, a married woman
may be sued without joining her husband, where the action
concerns her separate property. And by section 15 of said
chapter, she may be sued in any court of law or chancery having
jurisdiction, the same as if she were a *feme sole,* and any judg-
ment rendered against her in any such a suit is made a lien
against the *corpus* of her separate real estate. *Shenandoah
Valley R. R. Co.* v. *Dunlop, supra,* did not involve a contract
relating to the separate estate of a married woman, and the court
in that case says: "As to the effect of the wife's contracts
touching her separate estate, we say nothing, for no such question
arises in the present case." This Court has heretofore decided,
however, that under our statute the contract of a married woman
for the sale of her real estate, unless living separate and apart

from her husband, whether written or oral, cannot be specifically enforced. *Rosenour* v. *Rosenour,* 47 W. Va. 554.

But is this rule applicable to the case in hand? Mrs. Batson owned comparatively but a small interest in the land covered by the·contract. She was a devisee under the will of her father, G. H. A. Kunst. By his will, though giving his executor power to sell the residue of his estate real and personal, he specifically provided in relation to these coal lands that his executors should not sell them without the consent of the majority of his natural heirs; but when sold, it is provided the executor shall have power to convey the same. Whether under this will the consent of Mrs. Batson would have to be evidenced by her and her husband joining in the deed, or by power of attorney joined in by him, we need not decide, for the reason that she and her husband did join with the executors and others in the deed tendered appellant and approved in the decree appealed from. Aside from this the contract we have here was not originally made by the owners of the property, but by Goff, Reefer, Thorn and Brown. On its face it discloses the fact that the property which they undertook to sell 'was the property known as the Armstrong and Kunst property, and the John T. McGraw property, and the record discloses moreover that prior to the date of the contract appellant had interested itself in this property, knew that it was owned by Armstrong and Kunst, and had made inquiry as to the title, of McGraw as an attorney, and had been advised by him that in his opinion the title was good in Armstrong and Kunst.· So that if the fact of ownership was not fully disclosed on the.face of the contract the evidence renders it certain that appellant knew who owned the land, its general character and the nature of the title before entering into the contract, and knew at the time of the contract that, Goff, Reefer, Thorn and Brown did not have title to the land but represented the plaintiffs. The provision of the contract whereby they agreed to sell and convey said land in fee simple, free from incumbrances, by good and satisfactory general warranty deed or deeds, *executed by all necessary parties,* is significant of this fact and ·that both vendors and purchasers understood that while the vendors agreed to sell and convey, the conveyance was to be by the deed or deeds of the real owners, and which the vendor contracted to secure.

In such a case the general rule relied upon is without strict application. With knowledge of the location of the title, and that the vendors depended for literal performance of the contract on securing the approval of the owners, and procuring the deed to be executed by them; and with the further knowledge on the part of appellant that the vendors from the time of the contract had proceeded with the execution thereof, had secured the approval of the contract by the owners, and procured the deed for the property as tendered, there was no lack of mutuality of contract which will excuse specific performance thereof by the vendee. · *Dodson* v. *Hays,* 29 W. Va. 577; *Kennedy* v. *Ehlen,* 31 W. Va. 540; *Creigh* v. *Boggs, supra; Conaway* v. *Sweeney, supra; Elbon* v. *Adams,* 44 W. Va. 237; *Campbell* v. *Beard,* 57 W. Va. 501; *Woodruff* v. *Woodruff,* 44 N. J. Eq. 349 (16 Atl. 4). By these authorities the statute of frauds does not require that the agent shall sign the name of his principal, the signing of his own name being sufficient. One or more of them also affirm the proposition that the signing of a contract by one of two or more executors authorized to sell, whether afterwards actually approved by the co-executors or not, may be specifically enforced against those who did sign it; and that where one or two or more co-tenants makes a contract for the sale of land owned jointly, and the purchasers are put in possession, the act of one being for the benefit of all is binding, unless specifically shown to the contrary or repudiated; that if an agent be authorized to sell, though not in writing, his contract, if in writing and signed by him, either as agent or in his individual name, is binding upon the vendor and enforcible, our statute of frauds not requiring the authority of the agent to be in writing, or that he should sign the name of the party to be charged therewith; that it is not essential that the vendor, at the time of the contract, should have such title and capacity to convey the property, or such means and right to acquire it, as would enable him to fulfill it on his part; if he is able to convey when he is required by the contract, or the equity of the case it is sufficient. According to Pomeroy, 6 Pom. Eq. Jur. sections 769, 770, etc., want of mutuality at the time of the filing of the bill for specific performance is now the test. And it is said in the same connection that joining her husband in a suit for specific performance cures any want of mutuality in the contract.

Citing among other cases, *Hoover* v. *Calhoun,* 16 Grat. 109. We think, therefore, that the contract proven in this case not lack-. ing in mutuality in any such 'way as in this suit will excuse performance thereof by defendant.

Next, as to the mining rights. We have already indicated the opinion that defendant by its final election to take the property waived its right to interpose arbitrary objections to these mining rights, and the right of rescission .as provided thereby. But the question still remains whether the mining rights demanded were such as considering its final election and waiver of right to make arbitrary objections it had still reasonably the right to demand. In its answer appellant says that the contract was rescinded by it with honest purpose and in exercise of its plain rights under the contract, and "simply and solely because said plaintiffs, Armstrong and John H. Kunst then and there refused to remedy said mining rights as aforesaid and were unwilling to remove this defendant's objections thereto." We think this defense depends upon the question 'whether the mining rights owned by plaintiffs, and covered by their deed tendered, are reasonably sufficient for the mining and removing of · all the coal as contemplated by the contract. The mining rights conveyed and appertaining to each tract conveyed are not all uniform, but they are such mining rights as were owned by the grantors and as pertained to the various tracts and as reserved by or granted to them in the several deeds referred to, and they seem to us ample and sufficient for all practical purposes. The deed grants all the coal without reservations as to the manner of its removal. Generally the mining rights granted, in specific terms, give right of removal of all the coal from the particular tract and from co-terminous tracts, and through and under the same, and generally to do and perform all such acts as may be necessary and desirable for the purpose of obtaining and removing the coal. Some it is true provide that the coal may not be removed over the surface without consent, others that it is not to be removed over the top or surface except along the outer edge or outcrop of the coal, and others have other limitations not necessary to mention. But nowhere in pleadings or proofs, or in the arguments of counsel, is it shown that these mining rights thus .specifically · conveyed or necessarily and legally implied are not reasonably sufficient for the convenient mining

and removal of all of the coal conveyed, and from adjacent or co-terminous tracts.

The additional mining rights demanded by appellant are covered by a memorandum in writing submitted by Walsh, attorney, to Armstrong, July 25th, 1903. Some of them are clearly covered by the mining rights granted in the deed tendered, except perhaps as to coals that might thereafter belong to defendant, which we do not think could reasonably be required by the contract. Other demands were, the right to make and maintain all necessary and desirable dumps, air-ways, haulage-ways, drain-ways to, through and upon the surface of said land, and each and every part and parcel thereof; that there should be a covenant, to run with the land, against liability for subsidence of the surface, or for any injury thereon or therein occasioned by the mining, removing, coking, manufacturing or carrying away of said coal or the products thereof; the grant of a perpetual easement of support and maintenance of the Pittsburg seam, vein or bed of coal in its present natural condition and position, and a covenant not to do or to permit anything to be done at any time to cause the cracking, breaking or subsidence of said coal, or to in any way injure the mines, mining equipment, improvements, roads or water-ways of the defendant, its successors and assigns; a covenant that in mining and operating for any other coal, mineral oil or gas, reserved, the grantors, their heirs and assigns should not in any way or at any time violate said grant and covenant for support and maintenance, and that they, their heirs and assigns, should not at any time sink or bore wells for oil and gas, except through the solid coal of said Pittsburg vein, and upon the condition that they first pay appellant, its successors or assigns, a fair price for such Pittsburg vein, not less than one hundred feet square for each well, as it might be deemed necessary or desirable to leave in place to protect each well.

The question recurs are these such mining rights and privileges as under the contract and after appellant's "final election" to take the property could reasonably be demanded of the appellees? The right for dumps, air-ways, haulage-ways, etc., therein and on each and every part or parcel thereof is not shown to be reasonably necessary. Walsh, the attorney, says in his memorandum that in making this demand it was not intended to

indicate that appellant should have the right to do as it pleased with the surface. Hitched to the provision against liability for subsidence of the surface is the provision against liability which might be incurred by coking, manufacturing or carrying away said coal or the products thereof. The deed tendered gives full right to mine and remove all coal without express reservation of pillars for subjacent support of the surface. Plaintiffs answer the demand for this provision by citing *Griffin* v. *Coal Co.*, 59 W. Va. 480 (53 S. E. 24). This case holds that where a vendor sells and conveys his coal with right to enter, excavate and remove all the coal purchased, and the removal of all the coal necessarily causes the surface to subside or break, the grantee is not liable. But we need not and do not decide whether or not this be the law of the contract in this case, for in our opinion the mining rights owned and granted give the coal company adequate rights and all the rights which under the contract it is entitled to demand.

The demand to be absolved from liability for injuries resulting from coking, manufacturing and carrying away of said coal and the products thereof, so far as it pertains to the manufacture of coke was unreasonable. The contract contemplated no such right of manufacture.

The demand for a perpetual easement of support is not strictly speaking a mining right. The grant of the coal with right to take and remove all of it would entitle the grantee to subjacent support. If there had been a prior grant of some underlying strata, with the right to excavate and remove all of it, then *Griffin* v. *Coal Co.*, might justify this demand, but no such case is presented, and the common law right is all the protection that the grantee needs. So we see nothing reasonable in this demand.

The covenant demanded respecting the drilling for oil or gas is hardly to be considered a reasonable mining right. With such a covenant in the deed the owner could not bore for oil or gas at any place where the coal had been removed, certainly so long as any coal remained to be mined. Without such a covenant the owner of the oil or gas would be bound upon well settled legal principles to exercise his right so as to do no violence or injury to the rights of the owner of the coal. The

maxim *sic utere tuo ut alienum non laedas* would apply 'with full force.  *Chartiers Block Coal Co.* v. *Mellon,* 152 Pa. 286 (18 L. R. A. 702) ; *Rend* v. *Venture Oil Co.,* 48 Fed. 248.

As to what constitutes mining rights counsel quote from Barringer and Adams on Mines and Mining, chapter 19, page 576, as follows: "It is a general rule of law that, when anything is granted, all the means of attaining it and all the fruits and effects of it are also granted; when uncontrolled by express words of restriction all the powers pass 'which the law considers to be incident to the grant for the full and necessary enjoyment of it.  Consequently a grant or reservation of mines, gives the right to work them, to enter and to mine, unless the language of the grant itself provides otherwise or repels this construction.  And this right is so inseparable from a grant of minerals, that not only is it necessarily an implied incident thereof, but it and its derived rights cannot be restrained or excluded by a special affirmative power to do other acts, or by a grant of other privileges necessary or convenient to the working of mines."

In addition to these demands for additional mining rights, the point is made by the pleadings and in argument, that the grants of mining rights do not give the defendant the right to remove through certain tracts the coal from other tracts.  This proposition is answered by appellees' counsel in the language of *Lillibridge* v. *Lackawanna Coal Co.,* 143 Pa. 293, 13 L. R. A. 627, that "A grantor in fee of coal underlying his land 'with the right to mine and remove the same, cannot, at least before the vein has been exhausted, enjoin the grantee from using tunnels cut through the body of the coal for the removal of other coal from beneath lands adjoining those of the grantor."    The Pennsylvania court appears to have based this decision on MacSwinney on Mines, 67, 68, 69, and the English cases of *Bowser* v. *MacLean,* 2 De Gex, F. & J. 415; *Proud* v. *Bates,* 34 L. J. Ch. 406; *Hamilton* v. *Graham,* L. R. 2 Sc. & Div. App. 166; *Eardley* v. *Granville,* L. R. 3 Ch. Div. 826; and *Ramsay* v. *Blair,* L. R. 1 App. C. 701.    The *Lillibridge Case* was followed in *Webber* v. *Vogel,* 189 Pa. St. 158, 42 Atl. 4.    It is replied by appellant's counsel that the *Lillibridge Case* was defined and limited in *Webber* v. *Vogel,* and that it does not touch the question of surface rights; that the restrictions in some of the mining rights covered by plaintiffs, deed of October 9th, 1905

are antagonistic and in ·confusion; that the restrictions in the use of the surface, and against hauling coal from any except co-terminous tracts practically make separate coal fields out of tracts of coal that are physically contiguous, not relieved by the Lillibridge and other cases. In *Webber* v. *Vogel,* it was thought that the language of the *Lillibridge Case* might imply that the right of way would continue even after the exhaustion of all of the coal. This notion was disapproved and the right to haul coal from adjoining lands limited to the time when the coal in the land so traversed should be removed. But, as is suggested in argument, this limitation could easily be provided against by leaving some of the coal unmined until the coal from the adjoining tracts could be removed, and that if need be a few pillars could be left for subjacent support, which would answer all the requirements. The right to haul "co-terminous and other coals" is given in some of the deeds; in others the right is limited to "co-terminous" coals. But in all the right is given to remove all the coal, and to haul co-terminous coals, and it is insisted in argument that if these grants gave only the right to mine and remove all the coal in each case they would be sufficient, and all that appellant could reasonably require. On this question counsel for both parties rely upon and quote from Barringer and Adams on Mines and Mining, pages 576-7, as follows: "The right to work the mine involves the right to penetrate the surface of the soil for the minerals, to remove them in the manner most advantageous to the mine owner, and to use such means and process in mining and removing them as may be necessary in the light of modern improvements in the arts and sciences. The owner is not limited to such appliances as existed at the time of the grant; he may freely employ the means of invention; he may erect all adequate modern machinery for mining and draining. What is reasonably necessary is a question of fact which a jury may determine from the circumstances of each case. The bare right to work carries with it the right to use so much of the surface as may be reasonably necessary. The mine owner has the right to enter and take and hold possession even as against the owner of the soil, and to use the surface so far as may be necessary to carry on the work of mining, even to the exclusion of the owner of the soil." This we believe to be the law. But it is argued for appellant that the

surface of one tract cannot be used for hauling coal from other tracts. The answer to this proposition is that it is not shown in pleadings or proofs that it will be reasonably necessary to do so; that the mining engineers called as witnesses for the appellant were not called upon and did not testify that there would be necessity for this, and if there should be, it is affirmed, on the authority of *Consolidated Coal Co.* v. *Schmisseur,* (Ill.) 25 N. E. 795, that the mining rights granted by the deed of plaintiffs furnishes all the necessary surface rights. In this case the complainant, who had sold defendant the coal underlying her farm, and had leased him eleven acres of the surface for thirty five years, unless said coal should be sooner exhausted, in which event the lease should cease, "for the purpose of enabling the lessee to sink pits or shafts and successfully mine and remove said coal", was denied an injunction, within the thirty five years, and before all her coal had been exhausted, restraining defendant from using the leased premises for the transportation of coal mined by him on other land. We see nothing, therefore, in the character of the mining rights granted, and none are pointed out, precluding the coal company from removing the coal granted, or the coal from adjoining or contiguous lands, and having concluded that the right of appellant to impose arbitrary terms and conditions ceased with its final election, in May, 1903, to take the property, and as the mining rights granted, in legal effect with few exceptions give appellant practically all the rights covered by its demands for additional rights, and as appellant in its answer affirms that its attempt to rescind the contract was, "simply and solely" because plaintiffs refused to remedy the same, we see nothing to restrain a court of equity in decreeing specific execution of the contract.

But it is insisted that plaintiffs' title is defective, that abstracts were not furnished, and that specific execution should be denied on this ground. The record shows conclusively that an abstract satisfactory to Walsh, attorney for the defendant, was furnished. How complete the abstract was does not definitely appear. But a form of abstract was sent Walsh by Armstrong, and was approved by him, if accompanied by the original or copies of the deeds. Armstrong testified that on June 1st, 1903, he sent abstracts to Walsh, and on June 26th delivered him copies of

all deeds in the chain of title, and that all of these had been returned to his office in his absence in August following. Walsh did not testify, and Armstrong was not contradicted. The evidence shows that even if defendant had not made a complete examination of the title, it had substantially done so. The title had been the subject of inquiry, if not investigation, by appellant's counsel and agents, for months prior to the contract, and it 'was not until after the McGraw property had been secured and Knapp, president, seems to have concluded "the bloom was off the rye", and that the Armstrong and Kunst properties were not so desirable as they had been that the alleged defects in title were interposed. But as the coal company, according to its answer, undertook to rescind the contract "simply and solely" on the ground of defective mining rights, may we not assume that its objections to the title were rather feigned than real. With its answer and as showing defects in title the coal company exhibited the unsworn certificate of Hugh Warder, an attorney. But this amounts to nothing more than a pleading putting the facts in issue, and the burden of showing good title upon the plaintiffs. Such certificate or opinion of an attorney is not legal evidence. *Brackenridge* v. *Claridge,* (Tex.) 43 L. R. A. 595. Good or bad title cannot be proven by the mere opinion of an attorney or layman. *Scott & Woodruff* v. *Hughes,* 66 W. Va. 573 (66 S. E. 737), citing *Parks* v. *Morris, Layfield & Co.,* 63 W. Va. 51; 4 Wigmore on Evidence, section 2556; 5 Ency. Evidence 568.

The alleged defects of title relate mainly to irregularities in acknowledgments in ancient deeds; unreleased liens for purchase money, and deeds of trusts; judgments docketed, most, if not all, of them of ancient date, and all, or substantially all of them, apparently cured by time, the statute of limitations, and adverse possession. Defendant introduced no testimony relating to these alleged defects, not even of the attorney whose certificate is vouched therefor with 'its answer. The plaintiffs, however, assuming the burden, introduced the plaintiff Armstrong who showed by his testimony that most of the alleged defects had been cured by time, death, the statute of limitations, adverse possession, and releases obtained and recorded, and that no substantial defects of title, by incumbrance or otherwise, then existed, but that all had been cured in one way or another,

except the debt secured by a vendor's lien and decreed to be paid to Albert B. Batson, executor of James W. Batson, deceased, out of the purchase money decreed in favor of plaintiffs.

A mere incumbrance on real estate, which may readily be removed and discharged out of the purchase money, is not a bar to specific performance. *Hudson* v. *Max Meadows & Co.,* 97 Va. 343 (33 S. E. 586). The following general rules, supported by the authorities cited, are relied on by counsel and we think are applicable here, "It is sufficient for the seller, upon a contract made in good faith, if he is able to make the stipulated title at the time when, by the terms of his agreement, or by the equities of the particular case, he is required to make the conveyance, in order to entitle himself to the consideration." *Baldwin* v. *Salter,* 8 Paige 473; *Dresel* v. *Jordon,* 104 Mass. 416; *Wynn* v. *Morgan,* 7 Ves. Jr. 202; Story, Equity, sections 776-7. "A party filing a bill for specific performance, upon an offer of performance on his part, and a demand from the other party, must make the proper offer in his complaint; and if he is able to perform at the time of the final judgment, he is entitled to his relief, although he may not have been in a situation to perform it at the time he brought his suit. *Bruce* v. *Tilson,* 25 N. Y. 198; *Stevenson* v. *Maxwell,* 2 N. Y. 408; *Baldwin* v. *Salter,* 8 Paige 473." "Where the purchaser refuses to go on with his contract, the law permits the seller to file his bill without a tender on his part; which being so, it follows that all he need to do is to allege himself ready and willing; and if he can make title according to the requirements of the contract at the time of the decree, the court will aid him. *Oakey* v. *Cook,* 41 N. J. Eq. 364; *Watts* v. *Waddle,* 6 Pet. 389; *Hepburn* v. *Dunlop,* 1 Wheat. 179; *Hepburn* v. *Auld,* 5 Cranch, 262." *Townshend* v. *Goodfellow,* 3 L. R. A. 739. We see nothing substantial therefore in the defense of defects of title.

But it is insisted that the court below erred in overruling the defendant's motion for a title reference. This motion was made after the cause had been submitted and the court had had the case under consideration for more than a year and had announced its opinion that the plaintiffs were entitled to the relief prayed for. And the decree recites that the exceptions to the depositions were not brought to the attention of the

court, and were not passed upon. Upon the authority of *Middleton* v. *Selby,* 19 W. Va. 174; *Creigh* v. *Boggs,* 19 W. Va. 255, and *Smith* v. *Parsons,* 33 W. Va. 649, counsel for appellant affirm that where a doubt arises as to the title, or the defendant asks for a title reference, it is not only proper to refer the cause, but upon application it is error for the court to refuse to do so. These authorities do in terms so hold; but should this language be interpreted in its broadest sense, and as giving to the vendee the arbitrary right in all cases, regardless of the state of the pleadings and proofs, to subject the parties to the delay and costs of a reference? We do not think so. If all the facts necessary to show good title are already in the record, and the question of the sufficiency of the title must be finally determined by the court upon the report of the referee, we can not see what good a reference would accomplish. We think these authorities should be interpreted, in the light of prior and subsequent decisions, as meaning that where all the facts are not before the court, and the vendee applies therefor, and a doubt as to the title is presented, the court should refer the cause to a commissioner. This seems to be the view taken by this Court in *Tracewell* v. *Boggs,* 14 W. Va. 254, 262; and in Virginia in *Goddin* v. *Vaughn,* 14 Grat. 102, and followed in *Thomas* v. *Davidson,* 76 Va. 338, 343. The Virginia court says that it is not the universal rule to refer a cause to a commissioner to report on a title, though such reference may be proper, where the title is doubtful, or obscure, or dependent upon matters *in pais.* In *Thomas* v. *Davidson,* at page 343 it is said: "In the case before us, it is not suggested that any further information could have been obtained by further enquiry. All the evidence, which was almost conclusively documentary, was before the court. Upon this evidence, the court was certainly as competent to adjudicate the question of title as any commissioner would be, who might have been appointed. A report adverse to the title, it is fair to presume, would not have brought the learned judge to a different conclusion. A report favorable to it would only have subjected the parties to additional costs without any corresponding advantage." Appellees say the burden was upon appellant to show bad title. We can not concur in this view. This Court said in *Smith* v. *Parsons,* following

*Griffin* v. *Cunningham,* 19 Grat. 571, "that a vendor seeking specific performance must not only have a good title but he must show it." See, also, *Middleton* v. *Selby, supra,* and *Boggs* v. *Bodkin,* 32 W. Va. 566 (9 S. E. 891). The vendor must certainly present a title at least *prima facie* good.

But conceding that appellant's interpretation of the decisions be the true one, when should the application for the reference be made? In this case the motion was not made until the issues had been made up, the testimony all taken, the cause submitted to the court for final adjudication, and the court had had the case under consideration for more than a year, and had announced its opinion that the plaintiffs were entitled to the relief prayed for. Was appellant then entitled arbitrarily to demand a reference? We think the application then came too late; that the rule applicable is the same as if no application has been made, and that if appellees presented a good *prima facie* title no error was committed in overruling the motion. *Creigh's Adm'r* v. *Boggs, supra,* 255-6; *Middleton* v. *Selby, supra,* page 175. In the latter case the court says: "No application was made to the court for reference to a commissioner; and no proof whatever was taken to cast a doubt upon the evidence of the complainant, that he had both the legal and equitable title to the property."

But alleged defects in the title are pointed out, which it is claimed not only cast a doubt thereon, but show positive defects and insufficiencies therein. One of these is that certain of the deeds exhibited with the bill instead of being conveyances of coal, for which they are vouched therein, are conveyances of land in fee simple, and that other deeds conveying the surface and reserving the coal and mining rights are not exhibited. The deeds in fee seem to us to present a good *prima facie* title to the coal and mining rights. Besides, the deed tendered by plaintiffs, by date, parties and deed book and page where recorded, refers to all the deeds conveying the surface and reserving mining rights, so that if there was any question about the title to the coal and the character of mining rights reserved no testimony was taken by the appellant to throw the slightest doubt or suspicion upon the title. The questions again made as to the insufficiency of the mining rights appearing on the face of the deeds we again say are without merit.

Another point made is that the bill makes no reference to the first and third of seven deeds vouched in the deed tendered as title for the coal conveyed under the land known as the William Newlon land.  As the deed tendered conveys the coal with reference to all the deeds, though the two be not referred to in the bill, we see no merit in this point effecting the title thereto.

Another point is that another tract conveyed as containing 65 acres of surface, and 61 acres, 2 roods, and 13 poles of coal, is a part of another tract previously conveyed and described as a tract containing 116 acres, 3 roods, and 28 poles of surface and 86 acres, 2 roods, 31 poles of coal, and as having been conveyed to or reserved by the said Armstrong and Kunst by seven several deeds referred to in said deed.  We have examined these deeds and do not find any such duplication.  It is important to observe in this connection that there is an evident mistake in the printed record.  The original transcript filed shows the date of the deed vouched in the deed tendered for the 61 acres, 2 roods, 13 poles, of coal conveyed, is December 4th, 1882, and not as described in the printed record, December 4th, 1888.

But have appellees failed in any other particular to present good *prima facie* title?  We have already referred to the certificate of Warder, attorney, exhibited with defendant's answer, and to the testimony of Armstrong, in reference thereto, and have expressed the opinion that the evidence shows that all the supposed defects have been cured by time, by the statute of limitations, by adverse possession, or by releases secured and recorded. We have not overlooked that numerous exceptions to Armstrong's deposition were interposed while it was being taken.  Some of these exceptions may have been technically good, but we need not say which of them were well founded and which were not. All we need observe is that they were not insisted upon on the hearing, nor brought to the attention of the court, and the court not having been called to rule upon them, we must regard them as having been waived, except in so far and in so far only as any of the evidence may have been wholly incompetent. *Kirchner* v.' *Smith,* 61 W. Va. 434 (58 S. E. 618); *Woodville* v. *Woodville,* 63 W. Va. 286; 4 Ency. Dig. Va. & W. 'Va. Rep. 581, XV. D, and cases cited.  Giving to this evidence then such probative force as it is entitled to have as hearsay or secondary evidence with the exceptions thereto waived, we are of opinion

that the oral and documentary evidence introduced on both sides and taken as a whole, with no evidence whatsoever taken on the part of the defendant pointing out any substantial defects in the title, the plaintiffs must be regarded as having presented to the vendee a good *prima facie* title, entitling them to specific execution of the contract.

We pass the questions presented and argued on both sides, as to the waiver by the defendant of its arbitrary rights of rescission; the question of fraud alleged by plaintiffs and denied by defendant; and the question of no survey, except to say that we have already considered the question of waiver, and can add nothing material to what has been said in support of our conclusion.    On the question of fraud there is certainly sufficient in the correspondence between the parties, and in the evidence of the conduct of the appellant and its officers after its final election to take the property, to show a deliberate purpose to recede from its offer, and avoid its contract, and to support the allegations of the bill, so far as it is necessary to do so, for we cannot regard the question of fraud a very material one.    On the question of the survey contemplated by the contract, that was evidently to have been made by the coal company, and the record satisfies us that a careful survey of the coal had been made, and that appellant was fully advised as to location, acreage, quantity, and quality of the coal, and if not, it was not the fault of the plaintiffs, and that appellant has nothing to complain of in the decree on this account.    If therefore the acreage of coal called for by the deed tendered was deficient in any particular the facts could easily have been shown by the appellant, but nothing of the kind was undertaken.

The last point is that the court erred in charging appellant's interest on the entire purchase money from August 22nd, 1903. We think this complaint was well founded.    The theory upon which the court evidently proceeded was that appellant was liable for interest from the date when it undertook to rescind the contract.    This we think incorrect.    By the terms of the contract the balance of the purchase money was to have been paid under tender of a proper deed, or a good and sufficient deed or deeds; and the coal was to have been conveyed free from incumbrances.    It is conceded that there were numerous incum-

brances upon the property which continued until after suit was brought. And we do not think appellant waived its right to a deed such as the contract called for by its attempted rescission of the contract. The attempt is made to support the decree for this interest on the theory that appellant was let into possession at or about the date of the contract, and had thereafter enjoyed the rents, issues and profits, and got the advantage of any increase in the value of the property. In support of this doctrine reference is made to Pomeroy on Contracts, sections 495, 429; Warvelle on Vendors, section 180; *Hundley* v. *Lyons,* 5 Munf. 342; *Brockenbrough* v. *Blythe,* 3 Leigh 619; *Oliver* v. *Hallam,* 1 Grat. 298; *Bailey* v. *James,* 11 Grat. 468, and *Hoard* v. *R. R. Co.,* 59 W. Va. 97. While these authorities do support the propositions for which they are cited, they are inapplicable we think to this case. There is no evidence here that appellant had such possession as these authorities contemplate. It had no other possession, so far as the record shows, except such as was given by the contract for the purpose of removing a sufficient quantity of the coal for examination and testing, and of making a survey of the coal. It mined no coal for profit. It was not entitled under the contract to take coal for profits except upon full compliance with the terms of the contract. The record shows that on February 12th, 1904, plaintiffs through G. H. A. Kunst, one of the plaintiffs, tendered to Frank E. Brackett, in Cumberland, Md., a deed executed by Armstrong and John H. Kunst, in his own right, and as executor of G. H. A. Kunst, deceased, for the coal conveyed, but it is not shown that Brackett had authority to accept the deed. It was not tendered to the defendant company or to any officer shown by the record to have had authority in the premises. This deed was not tendered with the bill. The deed of October 9th, 1905, signed by all plaintiffs, and tendered May 4th, 1906, with the deposition of G. H. A. Kunst, and which was by the decree appealed from approved as sufficient, and which the defendant was thereby authorized to withdraw from the papers upon the payment of the purchase money decreed against it demanded and acknowledged receipt only for the principal of the purchase money. In view of these facts we do not think appellant was liable for interest except from May 4th, 1906. *Barrett* v. *McAllister,* 33 W. Va. 750; *Watson* v. *Coast,* 35 W. Va. 464; *Clark* v. *Gordon,* 35 W. Va.

736. The deed was tendered on May 4th, 1906. Appellant was then entitled to have paid the purchase money and accepted the deed. Not having elected to do so we think it should pay interest from that date.

For the error therein respecting interest we will correct the decree below, so as to include interest on the principal from May 4th, 1906, to February 12th, 1908, the date of decree, and not from August 22nd, 1903, as decreed below, and as so corrected the decree will in all other respects be affirmed.

Appellant having substantially prevailed here it will be decreed its costs in this Court.

Note: In a petition filed on behalf of appellant for a rehearing, two points are made which deserve consideration: The first is that the contract of January 21st, 1903, as subsequently ratified by plaintiffs was joint, and that the deed of October 9th, 1905, by which the grantors "warrant generally each to the extent of his own proportionate interest, and no further, the said Pittsburg vein of coal and mining rights hereby conveyed, &c.", is not a good execution of said contract on their part "to convey to said company in fee simple, free from incumbrance, by good and satisfactory general warranty deed or deeds, executed by all necessary parties." The general rule, as stated in Freeman on Co-Tenancy, section 209, and substantially in Rawle on Covenants for Title, section 25, upon the authority of *Coe* v. *Harahan*, 8 Gray 198, and 1 Dav. on Con. (3rd Ed.) 114, is that "An agreement to convey, entered into by several co-tenants, by which they stipulate that they will give a good and sufficient warranty deed, etc., does not require either to warrant the title of the others. It is complied with if each makes a separate deed of his moiety containing the stipulated covenant, or if all join in a deed in which each grantor warrants his share, but not that of his co-grantor." *City of Philadelphia* v. *Reeves*, 48 Pa. St. 476; *Donahoe* v. *Emery*, 9 Metc. 63, and *Click* v. *Green*, 77 Va. 836, cited and relied on by appellant's counsel are not in point. They were actions on deeds or contracts containing joint covenants. This is a case calling for specific execution of a contract for a deed.

The second proposition is, that as Armstrong died after the tender of the deed, and before the decree appealed from, his title

descended to his heirs, and they not having been brought in as parties before decree, the deed and decree do not pass the legal title of Armstrong to the grantees. On the death of Armstrong the cause was revived in the name of the curator of his estate, and so his estate was represented before the court in the final decree. But did the legal title pass to the grantee? It must be conceded that appellant was entitled to the legal title. The authorities hold that after the death of the vendor the personal representative, not his heirs or devisees, is the proper party plaintiff to enforce specific performance, but that the heirs or devisees, as the case may be, are proper and necessary parties, as having an interest in disputing the contract, although the legal estate be outstanding in a trustee. Fry on Specific.Perf., 100; Waterman on Specific Perf., section 63. The purpose of making them parties is to divest them of the legal title which descends to them upon the death of the ancestor. Waterman on Specific Perf., section 86. A different case is presented, however, where the vendor has in his life time brought his suit for specific performance and has tendered and filed with his bill, or in the cause pending the suit, his deed, duly executed and acknowledged, thus placing the legal title in the hands and under the control of the court, and beyond his dominion and control, and subject to its decree of specific performance. He has then done all in his power to perfect title in the vendee. There is then no reason, on the death of the vendor, *pendente lite,* for bringing in the heirs or devisees for the purpose of divesting them of the legal title. We have found one case, *Howard* v. *Higgins,* 137 Cal. 227, holding that after suit at law to recover the purchase money the mere offer to execute a deed and place it in the hands of the court is insufficient to constitute a tender of an executed deed to the defendant. But this is not the case we have here. Here the vendor in his life time brings suit, tenders a deed, parts with all dominion over it by delivering it into the custody and control of the court sufficient on decree to pass the legal title. In such case we think the principles governing in cases or *escrows* should apply where on the happening of the conditions precedent and delivery of the deed the title passes to the vendee, relating back to the date of delivery in *escrow.* 16 Cyc. 566; 11 Am. & Eng. Ency. Law, (2nd Ed.) 346. This is so also where a deed, bond or other

writing is to be delivered on the death of the grantor. See cases cited in 5 Cyclopedic Dig. Va. & W. Va. Reports, 153.

We see nothing in the petition calling for a rehearing, and it will be denied.

*Modified and Affirmed.*